14 F.3d 429
 62 USLW 2405
 CAL-ALMOND, INC., a California corporation Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE Defendant-Appellee.
CAL-ALMOND, INC., a California corporation, Saulsbury
Orchard and Almond Processing, Inc., Carlson
Farms, a sole proprietorship Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE Defendant-Appellee.
CAL-ALMOND, INC., a California corporation, Gourmet Packing
Co., a California corporation, Gold Hills Nut Co.,
Inc., a California corporation
Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE Defendant-Appellee.
CAL-ALMOND, INC., a California corporation, Gold Hills Nut
Co., Inc., a California corporation Plaintiffs-Appellants,
v.
UNITED STATES of America Defendant-Appellee.
 Nos. 92-16033, 92-16034, 92-16031 and 92-16527.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 12, 1993.
Decided Dec. 22, 1993.
 
 Brian C. Leighton, Clovis, CA, for plaintiffs-appellants.
 Jeffrica Lee, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before: CHOY, SCHROEDER, and BRUNETTI, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 Two groups of almond handlers are challenging various provisions of the California Almond Marketing Order, which regulates the California almond handling industry. Both groups challenge the United States Department of Agriculture ("USDA") almond marketing program administered by the California Almond Board (the "Board"). The first group is also separately challenging the assessment imposition procedure used by the Board from 1980 to 1986. The second group is separately challenging the validity of the reserve requirement rules for the crop years 1988-89 and 1990-91. The district court affirmed a USDA Judicial Officer decision upholding the Almond Marketing Order against these challenges, and the handlers appeal. We affirm the district court's decision on the assessment imposition procedure and the reserve requirement rules, but hold that the marketing program violates appellants' First Amendment rights to freedom of expression and association.
 
 I. THE ALMOND MARKETING PROGRAM
 
 2
 A. Facts and proceedings below.
 
 
 3
 Appellants Cal-Almond, Saulsbury Orchards, and Carlson Farms are "handlers" of California almonds. They receive almonds from growers, process them, and sell the resulting product, primarily for use as ingredients in candy, ice cream, and cereal. Cal-Almond and Saulsbury also operate mail-order businesses through which they sell whole almonds.
 
 
 4
 The California almond handling industry is regulated by the Almond Marketing Order, 7 C.F.R. Sec. 981 (the "Order"). The Order was established in 1950 by USDA pursuant to the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. Sec. 608c (the "Act"). The purpose of the Act is to "establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce" as "to avoid unreasonable fluctuations in supplies and prices." 7 U.S.C. Secs. 602(1), 602(4) (1988). The Act authorizes the Secretary of Agriculture (the "Secretary") to issue, following notice and an opportunity for hearing, marketing orders that will "tend to effectuate the declared policy of [the Act]" with respect to the particular commodity. 7 U.S.C. Sec. 608c(4) (1988).
 
 
 5
 The Order is administered by the Board, which has the power to "make rules and regulations to effectuate the terms and provisions" of the Order. 7 C.F.R. Sec. 981.38 (1993). The Board has ten members, all of whom are industry representatives appointed by the Secretary. The Board engages in a variety of activities, including research and development, marketing, quality control, and volume regulation. The Act specifically provides that the Order may establish "marketing research and development projects designed to assist, improve, or promote the marketing" of almonds. 7 U.S.C. Sec. 608c(6)(I) (1988). Pursuant to this authorization, the Board funds a generic pro-almond public relations program, consisting of such items as newspaper inserts containing almond recipes, leaflets and magazine articles about the benefits of almonds, promotional materials for school lunch programs, and press kits for industrial customers.
 
 
 6
 The money to pay for the Board's activities, including the marketing program, comes from assessments collected from handlers, based on the volume of almonds they handle. However, the Act and the Order provide that a handler's assessment will be reduced, up to a point,[1] by the amount that the handler spends on authorized advertising.[2] Before a handler can receive credit for his marketing promotion expenditures, the Board must determine that such expenditures meet the requirements of the "creditable advertising regulations" set forth in 7 C.F.R. Sec. 981.441.
 
 
 7
 The Order thus establishes an overall almond marketing program, which combines generic almond promotion conducted by the Board with Board-approved handler advertising. Beginning in 1984, appellant Saulsbury, which strongly opposed this program, refused to pay its annual assessments to the Board. In 1986, the United States sought an injunction in federal district court, pursuant to 7 U.S.C. Sec. 608a(6), to compel payment of some $300,000 in assessments which Saulsbury allegedly owed and had not paid to the Board. Saulsbury Orchards and Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1193 (9th Cir.1990). The district court granted summary judgment in favor of the government, and ordered Saulsbury to comply with the Order and pay the assessments. Id. The court refused to entertain Saulsbury's affirmative First Amendment defenses because it found that Saulsbury had not exhausted its administrative remedies pursuant to 7 U.S.C. Sec. 608c(15)(A).
 
 
 8
 In April 1987, Saulsbury, joined by appellants Cal-Almond and Carlson Farms, filed an administrative petition, pursuant to 7 U.S.C. Sec. 608c(15)(A), challenging numerous parts of the Order (including the almond marketing program) for the crop years 1980-87.[3] Following a hearing in the summer of 1989, a USDA administrative law judge ("ALJ") issued a decision on June 22, 1990 upholding some of appellants' challenges but rejecting others, including the challenge to the marketing program. Both sides appealed the ALJ's decision to the USDA Judicial Officer ("JO"). On January 23, 1991, the JO upheld the Order in all respects.
 
 
 9
 Meanwhile, Cal-Almond had filed another petition pursuant to 7 U.S.C. Sec. 608c(15)(A), challenging a specific section of the creditable advertising regulations, 7 C.F.R. Sec. 981.441(c)(2), for the crop year 1988. The ALJ upheld the challenge, but his decision was reversed by the JO. The two petitions were consolidated for cross-motions for summary judgment to the district court. On June 3, 1992, the district court issued an order upholding the JO's decisions in their entirety. Appellants appeal this order.
 
 
 10
 B. Standard of review.
 
 
 11
 We review de novo a district court's grant of summary judgment. T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629 (9th Cir.1987). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 
 12
 C. Discussion.
 
 
 13
 1. Infringement on appellants' First Amendment rights.
 
 
 14
 The district court held that the almond marketing program did not even implicate, let alone violate, appellants' First Amendment rights, "because plaintiffs are not 'compelled' to advertise." However, while the Order clearly does not compel appellants to advertise, it does compel them to expend a certain sum of money every year, on either assessments or creditable advertising. Since either alternative burdens appellants' First Amendment rights, these rights are clearly implicated by a program containing both.
 
 
 15
 Assume first that the creditable advertising regulations did not exist and that handlers paid the full amount of their assessment to the Board. A substantial portion of that amount would be used by the Board for the generic almond promotion program, which infringes on appellants' First Amendment right to be free from compelled speech and association. See United States v. Frame, 885 F.2d 1119 (3d Cir.1989), cert. denied, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990). Frame involved a First Amendment challenge to the Beef Promotion and Research Order, 7 C.F.R. Secs. 1260.101-.217, promulgated by USDA pursuant to the Beef Promotion and Research Act, 7 U.S.C. Secs. 2901-11. The Beef Promotion Order established a "Cattlemen's Board," whose goal would be to increase beef sales, and authorized it to collect an assessment of $1.00 per head of cattle from cattle producers and importers. Id. at 1122-23. Frame, a cattle breeder and auctioneer, refused to pay the assessment, and, when sued by the federal government, asserted that the Beef Promotion Act violated his First Amendment rights of free association and free speech. Id. at 1129.
 
 
 16
 The Third Circuit noted first that citizens arguably do not have the right to refuse to support financially government programs that involve speech they find objectionable. Id. at 1131. However, the court also found that the promotional expression sponsored by the Cattlemen's Board could not properly be characterized as "government speech"
 
 
 17
 Both the right to be free from compelled expressive association and the right to be free from compelled affirmation of belief presuppose a coerced nexus between the individual and the specific expressive activity. When the government allocates money from the general tax fund to controversial projects or expressive activities, the nexus between the message and the individual is attenuated. In contrast, where the government requires a publicly identified group to contribute to a fund earmarked for the dissemination of a particular message associated with that group, the government has directly focused its coercive power for expressive purposes ... This sort of funding scheme [establishes a] close nexus between the individual and the message funded.
 
 
 18
 Id. at 1132 (citations omitted) (emphasis added). The court found that the Beef Promotion Act implicated Frame's First Amendment rights because it resembled other funding schemes that the Supreme Court had held to implicate individuals' First Amendment rights. Id. at 1132-33, citing Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (union-management agency shop agreements, which require that every employee pay the union a service charge equal in amount to union dues, impinge on employees' rights to be free from compelled affirmation of belief and compelled association for expressive purposes) and Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state law requiring citizens to bear state slogan, "Live Free or Die," on automobile license plates, implicates First Amendment rights because law requires individuals to participate in the dissemination of an ideological message).
 
 
 19
 The Board's almond promotion program closely resembles the beef promotion program at issue in Frame. In both cases, a "publicly identified group" (cattlemen or almond handlers) must contribute money to fund the "dissemination of a particular message associated with that group." For the same reason that the beef program implicated Frame's First Amendment right to be free from compelled speech and association, then, the Board's promotional efforts implicate appellants'.
 
 
 20
 Assume next that the Order imposed on handlers no assessment or other compelled contribution to the Board whatsoever, but only required that they spend the equivalent sum every year on advertising that met the requirements of 7 C.F.R. Sec. 981.441. Such an Order also would clearly implicate appellants' First Amendment rights, both because it would compel them to speak and because it would impose content-based restrictions on that speech. See Wooley, 430 U.S. at 714, 97 S.Ct. at 1435 ("the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.").
 
 
 21
 Thus, both an assessment-only program and an advertising-only program would implicate appellants' First Amendment rights. Because the Order is a combination of both, it implicates those rights as well. USDA's argument that the creditable advertising regulations do not implicate those rights because they do not "compel" appellants to advertise ignores the fact that if handlers do not advertise according to the regulations, they must contribute their assessment to the Board,[4] which is itself a type of compulsion implicating appellants' First Amendment rights.
 
 
 22
 2. Type of speech restricted.
 
 
 23
 Having determined that the almond marketing program implicates appellants' First Amendment rights, we must now select the proper standard to evaluate the constitutionality of the program. Appellants claim, and we agree, that the program infringes on both their right to free speech and their right to free association. The Supreme Court has established different tests for each of these. Restrictions on lawful and non-misleading commercial speech[5] are evaluated using the three-prong standard of Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). First, the asserted government interest behind the restrictions must be "substantial." Id. at 566, 100 S.Ct. at 2351. Second, the restrictions must "directly advance[ ] the governmental interest asserted." Id. Third, the restrictions must be "not more extensive than is necessary to serve that interest." Id.
 
 
 24
 Government programs that compel association are evaluated under a more stringent standard. The Supreme Court has recognized that "[f]reedom of association ... plainly presupposes a freedom not to associate." Roberts v. United States Jaycees, 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). See also IDK, Inc. v. Clark County, 836 F.2d 1185, 1192 (9th Cir.1988) ("[t]he first amendment ... gives us the freedom not to assemble with those whose goals we do not share."). In Roberts, the Supreme Court held that infringements on the right of free association must be "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts, 468 U.S. at 623, 104 S.Ct. at 3252. The Frame majority applied this test to the Beef Promotion Act. See Frame, 885 F.2d at 1134. However, because we hold the almond marketing program unconstitutional even under the less stringent Central Hudson standard, we do not decide which of these two should apply. See id. at 1146 (Sloviter, J., dissenting).
 
 
 25
 Appellants contend that their own almond advertising contains a mixture of commercial and political speech and is therefore entitled to a higher level of protection under Riley v. National Fed'n of Blind, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Riley addressed a First Amendment challenge to a North Carolina requirement that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous twelve months that were actually turned over to charity. Id. at 795, 108 S.Ct. at 2676-77. The Supreme Court found the regulation unconstitutional under strict scrutiny. Id. at 798, 108 S.Ct. at 2678. The Court applied strict scrutiny because although the speech at issue was arguably commercial, and thus subject to a more deferential standard of review, "the speech [does not] retain[ ] its commercial character when it is inextricably intertwined with otherwise fully protected speech"--in that case, charitable solicitation. Id. at 796, 108 S.Ct. at 2677 (emphasis added).
 
 
 26
 In the present case, however, the commercial speech, although arguably "compelled," is not inextricably intertwined with higher-value noncommercial speech. Appellants' political appeals are not essential components of their advertisements. "[A]dvertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech." Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 637 n. 7, 105 S.Ct. 2265, 2274 n. 7, 85 L.Ed.2d 652 (quotation omitted). Thus, the Riley rationale for applying strict scrutiny is not present here.3. Application of the Central Hudson test.
 
 
 27
 Once again, for the almond marketing program to be constitutional, (a) the asserted government interest behind it must be "substantial," (b) the program must "directly advance" that interest, and (c) the program must not be more extensive than necessary to serve that interest. Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351. USDA has the burden of justifying the program by presenting evidence sufficient to satisfy these requirements. Edenfield v. Fane, --- U.S. ----, ----, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993).
 
 
 28
 (a) Substantial government interest.
 
 
 29
 We "must identify with care the interests the State itself asserts." Edenfield, at ----, 113 S.Ct. at 1798. USDA claims that the government has a "compelling and important interest in promoting the consumption of almonds" in order to "provide for greater stability in the products of agriculture" and "protect the income of farmers." Brief for the Appellee at 32. The Act itself states that the purpose of the creditable advertising program is to "assist, improve, or promote the marketing, distribution, and consumption of [almonds]." 7 U.S.C. Sec. 608c(6)(I) (1988). See also 36 Fed.Reg. 20,887, 20,888 (1971) (the program will "provide an additional method of stimulating almond consumption"); 35 Fed.Reg. 7428, 7432 (1970) (the program will provide the "opportunity to stimulate the demand for almonds"). We agree that stimulating the demand for almonds in order to enhance returns to almond producers and stabilize the health of the almond industry is a substantial state interest. See Frame, 885 F.2d at 1134 (government has a compelling interest in "maintaining and expanding beef markets" in order to "prevent[ ] further decay of an already deteriorating beef industry).
 
 
 30
 (b) Direct advancement of the interest.
 
 
 31
 Next, USDA must show that the program "directly advances the governmental interest asserted." Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351. "[T]he regulation[s] may not be sustained if [they] provide[ ] only ineffective or remote support for the government's purpose." Id. at 564, 100 S.Ct. at 2350. Furthermore, we may not simply defer to legislative and executive judgment on this question; we must determine ourselves whether the program directly advances USDA's asserted interests. City Council v. Taxpayers for Vincent, 466 U.S. 789, 803 n. 22, 104 S.Ct. 2118, 2127 n. 22, 80 L.Ed.2d 772 (1984). We apply this test first to the creditable advertising regulations specifically, and then to the overall almond promotion program.
 
 
 32
 Because the Order forces each handler to fund Board promotional efforts with every assessment dollar not spent on creditable advertising, USDA must show both that the advertising for which credit is granted is better at selling almonds than the Board's own efforts and that the advertising for which credit is denied is worse at selling almonds than the Board's own efforts. As a starting point for our analysis, therefore, we must determine how effective the Board's own almond promotion efforts are. USDA has presented little solid evidence on this question. The following exchange, which occurred at the hearing before the ALJ between counsel for Cal-Almond and Skip Hubbard, chairman of the Board's Public Relations and Advertising Committee, is highly instructive:
 
 
 33
 Q: [H]as the Public Relations and Advertising Committee since you have been chairman, ever hired somebody to analyze whether or not the creditable advertising rules and the assessment amount spent on advertising, have caused more sales of almonds?
 
 
 34
 A: It has not been--we have not ha[d] a survey conducted.
 
 
 35
 Q: So would it be safe to say that you don't have any empirical data as to whether or not the advertising assessments have assisted in the ... sale and consumption of almonds?
 
 
 36
 A: No study has been made on that.
 
 
 37
 Q: Has any study been made as to whether or not certain provisions of section 981.441 have created more sales or less sales than other provisions?A: We have not commissioned any study for that. [ ...]
 
 
 38
 Q: [ ...] Has the Almond Board, the Public Relations and Advertising Committee, ever made a determination as to whether or not the advertising itself, or the promotion itself, done by the Board has increased grower returns?
 
 
 39
 A: The Committee believes that the promotional activities are beneficial to grower returns.
 
 
 40
 Q: [ ...] Has any study been conducted?
 
 
 41
 A: No.
 
 
 42
 Transcript of 1/25/90 hearing before USDA ALJ Hunt at 158-60.[6] Because USDA has presented little or no evidence regarding the effectiveness of the Board's promotional efforts, it cannot show that the creditable advertising regulations "directly advance" the government's interest in increased almond sales by enhancing the effectiveness of those efforts.[7] See Edenfield, --- U.S. at ----, 113 S.Ct. at 1800 (Florida Board of Accountancy fails to justify ban on personal solicitation of prospective business clients by accountants when it provides no studies or anecdotal evidence suggesting that such solicitation creates the asserted dangers of fraud, overreaching, or compromised independence).
 
 
 43
 In fact, most of the evidence in the record indicates that the regulations hinder the handlers' efforts to increase sales and returns to growers. For example, most of appellant Saulsbury's sales were to cereal companies, but Saulsbury could not receive credit for advertising the cereals containing its almonds because the regulations deny credit for products that do not contain at least 50 percent raw shelled almonds by weight and do not display the handler's brand. See 7 C.F.R. Sec. 981.441(c)(3)(iv). When a chain of mini-markets in the Boise, Idaho area agreed to carry Saulsbury almonds, Saulsbury could not receive credit for advertisements directing consumers to those stores because the regulations deny credit for advertisements directing consumers to retail outlets not "operated" by a handler. See 7 C.F.R. Sec. 981.441(c)(5)(iii). Because of these restrictions, Saulsbury estimated that every dollar spent on creditable advertising returned less than fifty cents in sales.
 
 
 44
 Cal-Almond's experience with the regulations was similarly disappointing. Cal-Almond exports approximately 90 percent of its almonds for use as ingredient items, and nearly all of the almonds it sells domestically are used in ice cream. However, like Saulsbury and cereal, Cal-Almond cannot obtain credit for advertising this ice cream because the regulations forbid it. The only creditable advertising of any use to Cal-Almond is that promoting its mail order business, which is not a profitable undertaking.[8] Overall, the evidence indicates that the regulations hinder, rather than help, appellants' efforts to sell their almonds.
 
 
 45
 Finally, there is no evidence that the regulations stimulate additional or more effective advertising from other handlers. Blue Diamond is by far the largest handler and overwhelmingly dominates the retail market;[9] to "directly advance" the government interest in increasing almond sales, the regulations would have to give Blue Diamond an incentive to advertise more. The record indicates, however, that they do not. Roger Baccigaluppi, the president and chief executive officer of Blue Diamond, testified that Blue Diamond would "probably" continue to spend just as much money advertising even if the regulations did not exist. Walter Payne, Blue Diamond's vice president for sales, marketing and distribution, testified that Blue Diamond would advertise the same amount and in the same manner in the absence of the regulations.
 
 
 46
 In sum, the record indicates that the regulations do not stimulate additional or more effective advertising from Blue Diamond. Appellants have presented evidence showing that the regulations hinder their own marketing efforts, and USDA has presented no evidence that the regulations assist the efforts of other handlers. Therefore, we hold that the regulations do not "directly advance" the government's asserted interest in increased almond sales and are therefore an unconstitutional restriction on appellants' First Amendment rights.
 
 
 47
 Whether the entire assessment-funded almond promotion program "directly advances" the governmental interests in increased almond sales and returns to growers is a more difficult question. The Supreme Court assumes as a matter of law that advertising increases consumption of the product or service being advertised. See Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 342, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) ("[w]e think [that] the legislature's belief [that advertising of casino gambling would serve to increase the demand for the product advertised] is a reasonable one"); Central Hudson, 447 U.S. at 569, 100 S.Ct. at 2353 ("[t]here is an immediate connection between advertising and demand for electricity."). Therefore, we may reasonably assume that the Board's promotional efforts have some positive effect on almond demand (although, as noted above, the Board does not know how significant the effect is).
 
 
 48
 However, because these efforts are funded with money that handlers would presumably have spent on their own advertising, we cannot compare the Board's program with a no-advertising situation; we must compare it to a situation where handlers spent their assessments on their own marketing. USDA has presented no evidence tending to show that the generic Board promotion financed by that money sells almonds more effectively than the specific, targeted marketing efforts of individual handlers.[10] We agree with appellants' argument that each handler knows best how to sell his own almonds; we are unwilling to presume, in the absence of hard evidence to the contrary, that a government agency is better at marketing than an individual businessperson. The USDA has failed to meet its burden of showing that the overall almond marketing program "directly advances" its stated goals of selling more almonds and increasing returns to producers.[11]
 
 
 49
 (c) Not more extensive than necessary.
 
 
 50
 USDA must prove that the regulations are no more extensive than necessary to serve the interest of increasing almond sales. The Supreme Court held in Board of Trustees of State Univ. v. Fox that this standard is not as strict as a "least restrictive means" test:
 
 
 51
 What our decisions require is a fit between the legislature's ends and the means chosen to accomplish those ends--a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective. 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989).
 
 
 52
 USDA asserts that "[a]lthough it is possible that some forms of advertising, though ineligible for credit, might also increase the sale of almonds, the regulations reflect a reasonable judgment that the Board will make better use of those monies in its market promotion programs." However, once again, USDA offers no evidence in support of this "reasonable judgment." It certainly seems reasonable to assume that the advertisements for which credit is explicitly permitted--generic advertisements, expenditures for advertisements announcing future promotion activities, and in-store supermarket advertisements--will increase almond sales. However, USDA offers no justifications for the restrictions that deny credit for certain advertisements: ads promoting more than two complementary branded products (Sec. 981.441(c)(5)(i)), ads promoting a product that also has "competing nuts" (Sec. 981.441(c)(5)(ii)), or ads promoting retail stores not owned by handlers (Sec. 981.441(c)(5)(iii)). It is true that the fit between means and ends need not be perfect, but there seems to be no logical justification for these types of restrictions other than the restrictions are designed to benefit Blue Diamond, who overwhelmingly dominates the retail almond market, at the expense of smaller handlers such as appellants, who sell primarily to ingredient manufacturers. This court has interpreted Fox as holding that "restrictions which disregard far less restrictive and more precise means are not narrowly tailored." Project 80's, Inc. v. City of Pocatello, 942 F.2d 635, 638 (9th Cir.1991). The creditable advertising regulations disregard such means, and therefore are more extensive than necessary to serve the interest of increasing almond sales. As the USDA has failed to present sufficient evidence to satisfy the requirements of the Central Hudson test, the Almond Marketing Program violates appellants First Amendment rights.
 
 II. THE ASSESSMENT IMPOSITION PROCEDURES
 
 53
 A. Facts and proceedings below.
 
 
 54
 As noted above, the funds required to finance the Board's activities are generated through assessments authorized by the Act. The Order specifically provides that the assessment shall be "such rate per pound of almonds ... received by [the handler] for his own account ... as the Secretary finds is necessary to provide funds to meet the authorized [B]oard expenses and the operating reserve requirements." 7 C.F.R. Sec. 981.81(a) (1993).
 
 
 55
 For the crop years 1980 through 1986, USDA issued final rules containing budget estimates and assessment rates without first publishing a proposed rule and requesting comments. Appellants contend that this procedure violated the rule making requirements of the Administrative Procedure Act (APA), which requires "[g]eneral notice of proposed rule making ... unless persons subject thereto are named and either personally served or otherwise have actual notice thereof." 5 U.S.C. Sec. 553(b) (1988) (the "notice" requirement). The agency is also required to give "interested persons an opportunity to participate in the rule making" (the "comment" requirement) and "[a]fter consideration of the relevant matter presented ... incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. Sec. 553(c) (1988). In addition to the time required for the notice-and-comment procedure, an additional thirty days must pass between the time the final rule is passed and the time it takes effect. 5 U.S.C. Sec. 553(d) (1988).
 
 
 56
 Following appellants' administrative challenges to the assessment imposition procedure,[12] the ALJ found that notice and comment pursuant to the APA should have been allowed. The JO disagreed and ruled that "good cause" existed for dispensing with notice and comment because the Secretary had discretion to authorize such expenses as were reasonable and likely to be incurred and because arriving at the assessment rate was a ministerial and mechanical calculation. The district court agreed with the JO.
 
 
 57
 B. Discussion.
 
 
 58
 1. Notice and comment.
 
 
 59
 We review de novo "the district court's determinations on issues of statutory interpretation, including the scope of the notice-and-comment and publication requirements imposed by the APA." Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1011 (9th Cir.1987). We hold that although the assessments are "rules" subject to the notice-and-comment requirement of the APA, the Secretary's failure to give notice and request comments was harmless.
 
 The APA defines a "rule" as
 
 60
 the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates.
 
 
 61
 5 U.S.C. Sec. 551(4) (1988) (emphasis added). We agree with appellants that establishing an assessment is a "prescription for the future of rates." The Order itself defines the assessment as a "rate per pound of almonds." 7 C.F.R. Sec. 981.81(a) (1993). USDA's argument that the assessment procedure is not a rule because it is simply the mechanical result of the Secretary's approving an agency's budget fails under the D.C. Circuit's opinion in Batterton v. Marshall, 648 F.2d 694 (D.C.Cir.1980). There, the court held that the exemption for budgetary approval does not apply "where the agency action trenches on substantial private rights and interests." Id. at 708 (footnote omitted). Because the assessment rate directly affects the financial interests of appellants and other almond handlers, it is not exempt from the notice-and-comment requirements of the APA.
 
 
 62
 The district court held that the Secretary's failure to follow the notice-and-comment procedure was excused by the "good cause" exception to the APA, which excuses such failure
 
 
 63
 when the agency for good cause finds (and incorporates the finding and a brief statement of reasons thereof in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
 
 
 64
 5 U.S.C. Sec. 553(b)(B) (1988) (emphasis added). The announcement accompanying the rules provided the following justification for dispensing with the notice-and-comment procedure:
 
 
 65
 To enable the Board to meet crop year obligations, approval of the expenses and assessment rate is necessary without delay. Handlers and other interested persons were given an opportunity to submit information and views on the expense and assessment rate at an open meeting of the Board. To effectuate the declared purposes of the [A]ct it is necessary to make these provisions effective as specified.
 
 
 66
 45 Fed.Reg. 56,794 (1980). USDA contends that since the Board's annual harvest forecast and proposed budget both depend on crop projections for that year, the formulation of a recommended budget and assessment rate cannot be accomplished early enough to allow for both notice and comment and the postponement of the effective date of the rule until 30 days after publication, as required by the APA.[13]
 
 
 67
 We disagree, based on our opinion in Riverbend Farms Inc. v. Madigan, 958 F.2d 1479 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). In Riverbend Farms, handlers of navel oranges challenged the procedure used by the Secretary to set weekly volume restrictions on the marketing of the oranges. We first noted that
 
 
 68
 the good cause exception goes only as far as its name implies: It authorizes departure from the APA's requirements only when compliance would interfere with the agency's ability to carry out its mission. The agency thus must minimize conflict with the APA by complying with those APA requirements it is capable of complying with.
 
 
 69
 Id. at 1485. We then held that even though the volume-setting meetings were conducted weekly, the Secretary had no reason not to give notice of them (by means of publication in the Federal Register ) or allow written comments before promulgating weekly volume restrictions. Id. at 1486. Because we found no reason in Riverbend Farms to depart from the notice-and-comment procedure for weekly meetings and rules, we can discern no good cause here for the Secretary's failure to follow the procedure for annual meetings and rules.
 
 
 70
 We also cannot find good cause for the failure to wait thirty days before allowing the rule to take effect. In Riverbend Farms, we noted two reasons for the waiting period: it gives affected parties time to adjust their behavior before the final rule takes effect, and it usually causes no harm. Id. at 1485. These reasons apply to the almonds context. From 1980 to 1986, delaying the effective date of the rules by thirty days would have caused no harm, because the Secretary always waited at least thirty days before adopting a final rule anyway. Furthermore, the thirty days would have given handlers an opportunity to estimate their future costs and prices before the rule went into effect. Therefore, we can see no reason not to follow this requirement, and hold that the Secretary has failed to provide good cause for his failure to follow the procedure mandated by the APA.
 
 
 71
 However, we find this failure to be harmless. "We have held that the failure to provide notice and comment is harmless only where the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.' " Riverbend Farms, 958 F.2d at 1487 (quoting Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 764-65 (9th Cir.1986)). Our harmless error analysis "must therefore focus on the process as well as the result." Id. (emphasis added). In Riverbend Farms, we ultimately concluded that the Secretary's failure to comply with the APA's notice-and-comment requirements in promulgating the weekly navel orange volume restrictions was harmless because the handlers knew that there would be meetings every Tuesday, that proposed restrictions would be contained in a position paper issued prior to the meetings, and that the meetings would provide the opportunity for public comment. Therefore, the handlers were not prejudiced by the Secretary's failure to follow the notice and comment procedure, and the error was harmless. Id. at 1488.
 
 
 72
 The Secretary's error in the instant case is harmless for the same reasons. The Board holds open meetings in July of each year to gather information relevant to estimating its budget and the resulting assessment rate. During these meetings, the Board receives comments and testimony from any and all interested parties. After deciding on its recommendations, the Board directly notifies each almond handler of the proposed assessment rate. The Board then submits its recommendations to the Secretary for approval; from 1980 to 1986, the assessment rate set by the Secretary in the final rule was the same as the rate that had been recommended by the Board. Therefore, under Riverbend Farms, any error made by the Secretary in not following the notice and comment procedure was harmless.
 
 
 73
 2. Validity of allegedly "retroactive" assessments.
 
 
 74
 From 1980 to 1986, the final rules establishing the annual assessments were not issued by the Secretary until at least several weeks after the beginning of the crop year. However, appellants had by that time already received a significant quantity of almonds, and the assessments were applied to those almonds as well. Appellants claim that doing so transformed the assessments into impermissible "retroactive" rules.
 
 
 75
 The Supreme Court has noted that administrative rules must be statements that have legal consequences only for the future. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 217, 109 S.Ct. 468, 476, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). "Retroactive" rules--those that alter the past legal status of past actions--are "not favored in the law." Id. at 208, 109 S.Ct. at 471. However, they are permitted if the power to promulgate them "is conveyed by Congress in express terms." Id. (emphasis added).
 
 
 76
 We agree with the district court that even if the assessments are retroactive rules, Congress expressly granted the Secretary the power to promulgate them. The Act provides that handlers shall pay assessments for such expenses "as the Secretary may find are reasonable and are likely to be incurred by such authority or agency, during any period specified by him." 7 U.S.C. Sec. 610(b)(2)(ii) (1988). Since the Order specifies the crop year to be the relevant "period," the Secretary may impose the assessment on all almonds received during that time. As the district court pointed out,
 
 
 77
 [t]he statutory language of Section 610(b)(2)(ii) mandates that each handler's pro rata share of the Almond Board's expenses must be based on the volume of all of the commodity covered by the marketing order. The focus of the statute is on the 'expenses likely to be incurred ... during any period specified by [the Secretary].' The period specified by the Secretary is the crop year July 1 through June 30. Therefore, the statute requires a handler to share pro rata in any expenses likely to be incurred by the Almond Board during a crop year.
 
 
 78
 We hold that even if the assessment rules are "retroactive," they are permissible because they were authorized by Congress in the Act.
 
 
 79
 3. Statement of basis and purpose.
 
 
 80
 Appellants contend that the final 1980-1986 assessment rules failed to comply with the substantive requirements of the APA because they did not include a "general statement of their basis and purpose" as required by 5 U.S.C. Sec. 553(c). However, regulations with no statement of basis and purpose have been upheld where the basis and purpose was considered obvious. See Citizens to Save Spencer County v. E.P.A., 600 F.2d 844, 884 (D.C.Cir.1979). This is just such a case. The "purpose" of the assessment is clearly to fund the Board's operations, and the "basis" of the rate is the mechanical application of the statutory formula. Because the basis and purpose of the assessment rate are obvious, no express statement was necessary to comply with the APA.
 
 III. THE RESERVE REQUIREMENTS
 
 81
 A. Facts and proceedings below.
 
 
 82
 The reserve requirement is the mechanism the Board uses to regulate the volume of almonds entering the market, pursuant to the Act's goals of protecting almond prices and maintaining an orderly flow of almonds to market. 7 U.S.C. Sec. 608c(6)(A), (C) (1988). Every year, the Board recommends to the Secretary what percentage of the total almond crop should be "salable" and what percentage should be held in "reserve" by handlers. 7 C.F.R. Sec. 981.49 (1993). Handlers may only sell the salable percentage of almonds they receive; they must withhold from marketing an amount equal to the reserve percentage. 7 C.F.R. Sec. 981.50 (1993). The Secretary designates the final percentage based on the Board's recommendation and "any other available information." 7 C.F.R. Sec. 981.47 (1993).
 
 
 83
 The almond crop year begins on July 1 and ends June 30. 7 C.F.R. Sec. 981.19 (1993). For the 1988 crop year, the Board recommended a 25 percent reserve requirement on July 20, 1988; the Secretary issued a proposed rule incorporating this recommendation on September 16, 1988, allowing 15 days for comment; and issued the final rule establishing the 25 percent reserve requirement on January 25, 1989. For the 1990-91 crop year, the Board recommended a 35 percent reserve requirement; the Secretary issued a proposed rule on August 10, 1990, with the same 15-day comment period; and the Secretary issued the final rule on September 21, 1990.
 
 
 84
 Appellants Cal-Almond, Gourmet Packing, and Gold Hills filed administrative petitions, pursuant to 7 U.S.C. Sec. 608c(15)(A), challenging the lawfulness of the procedures used by the Secretary to establish the 25 percent reserve requirement for the 1988-89 crop year; the validity of certain actions that the Board and Secretary require handlers to take to comply with the reserve requirement; and the validity of Secretary's imposing assessments on reserve almonds. After consolidation, the ALJ rejected most of the challenges, but held that the 1988-89 reserve and assessment rules were invalidly retroactive. On appeal, the JO upheld the Secretary's actions in all respects and the district court did the same.
 
 
 85
 Appellants Cal-Almond and Gold Hills had also filed an administrative petition challenging various USDA actions under the Order for the crop year 1990-91. The ALJ rejected their challenges and the JO affirmed. After appellants filed suit in district court, the parties stipulated that the district court should grant summary judgment for USDA without prejudice to appellants' right to appeal, which the district court did. Appellants appeal both judgments.
 
 
 86
 B. Discussion.
 
 
 87
 1. Lawfulness of 1989-90 and 1990-91 reserve obligation rules.
 
 
 88
 (a) Retroactivity.
 
 
 89
 Appellants claim that the 1988-89 and 1990-91 reserve obligation rules were unauthorized retroactive rules. We hold that even if the rules were retroactive, they were expressly authorized by Congress and were therefore valid. Georgetown Univ. Hosp., 488 U.S. at 208, 109 S.Ct. at 471-72. The Act provides that marketing orders may contain terms
 
 
 90
 [a]llotting, or providing methods for allotting, the amount of [a] commodity ... which each handler may market ... under a uniform rule based upon the amounts which each such handler has available for current shipment, or upon the amounts shipped by each such handler in such prior period as the Secretary determines to be representative, or both, to the end that the total quantity of such commodity ... to be marketed ... during any specified period or periods shall be equitably apportioned among all of the handlers thereof.
 
 
 91
 7 U.S.C. Sec. 608c(6)(C) (1988). The focus of the statute is on the total quantity of almonds to be marketed during any period specified by the Secretary--in this case, the July 1-June 30 crop year. The statute requires the total quantity of almonds salable during this period to be allotted "equitably" among the handlers. To do so, the Secretary has to take into account almonds shipped between the beginning of the crop year and the issuance of the final reserve rule. Thus, the reserve obligation rules, even if retroactive, are authorized by the Act.
 
 
 92
 (b) Arbitrariness.
 
 
 93
 We may set aside an agency's decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Citizens for Clean Air v. E.P.A., 959 F.2d 839, 844 (9th Cir.1992) (quotation omitted). Appellants contend that the final 1988-89 reserve obligation rule was arbitrary and capricious because it was issued after undue delay. The Board recommended the 25 percent reserve obligation on July 20, 1988. The Secretary issued a proposed rule on September 16, 1988, but did not issue a final rule until January 25, 1989, over four months later, and seven months into the crop year. According to appellants, the most active times for almond sales are in late summer and early fall; consequently, appellants argue, it was arbitrary and capricious for the Secretary to have waited until well after this time had passed to issue a final reserve obligation rule.
 
 
 94
 However, appellants have cited no cases, and we have found none, holding that an agency's delay in issuing a rule makes the rule itself arbitrary or capricious. Therefore, although the delay was certainly unfortunate and should be avoided in the future, it was not arbitrary or capricious.[14]
 
 
 95
 Appellants also contend that the 1988-89 and 1990-91 reserve obligation rules were arbitrary and capricious because they did not include a sufficient statement of basis and purpose as required by 5 U.S.C. Sec. 553(c). We disagree. In the 1988-89 rule, USDA set out its calculations of supply and demand for California almonds and explained why a 25 percent reserve obligation was necessary:
 
 
 96
 While this rule may restrict the amount of almonds which handlers may sell in normal domestic and expert markets, the salable and reserve percentages are needed to lessen the impact of the projected oversupply situation facing the industry and to promote stronger marketing conditions, thus avoiding unreasonable fluctuations in prices and supplies and improving grower returns. The reserve percentage is designed to reduce the oversupply situation in the industry in the 1988-89 crop year by holding off the market a percentage of the available almonds that could be added to an already fully supplied market. If the reserve were zero and all available California almonds were salable, almond prices, in a market which already has record supplies on hand, would be expected to drop in both domestic and foreign markets. Thus, the Board's recommendation for a 25 percent reserve is designed to effectuate the purposes of the Act by avoiding unreasonable fluctuations in supplies and prices.
 
 
 97
 54 Fed.Reg. 3584 (1989). A similar statement was included for the 1990-91 reserve obligation rules. See 55 Fed.Reg. 38,793, 38,794 (1990). Both statements explain the rules' basis (almond supply and demand estimates) and purpose (avoiding unreasonable fluctuations in supplies and prices).
 
 
 98
 Furthermore, USDA addressed the primary comments on the proposed reserve obligations that were made during the 15-day notice and comment period, such as objections to the crop size estimates, demand estimates, and reserve obligation size. See 54 Fed.Reg. 3584, 3585-87 (1989); 55 Fed.Reg. 38,793, 38,794-97 (1990).[15] The rules thus satisfied the requirement that they "indicate the major issues of policy that were raised in the proceedings and explain why the agency decided to respond to these issues as it did." Independent United States Tanker Owners Comm. v. Dole, 809 F.2d 847, 852 (D.C.Cir.), cert. denied, 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987).
 
 
 99
 Finally, appellants claim that the reserve obligation rules were arbitrary and capricious because USDA did not follow the dictates of Departmental Regulation (DR) 1512-1 in promulgating them. We have no authority to review appellants' challenge, because section 1 of DR 1512-1 states that "[t]his directive ... is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the Department, its agencies, its officers or employees or any other person." See Michigan v. Thomas, 805 F.2d 176, 187 (6th Cir.1986) (this language evinces "clear and unequivocal intent that agency compliance with Executive Order 12,291 not be subject to judicial review").
 
 
 100
 2. 1990-91 agency agreements for reserve almond disposition.
 
 
 101
 A handler has two alternatives for disposing of reserve almonds. First, the handler may turn them over to the Board, which has the "power and authority to sell or dispose of any and all reserve almonds withheld upon the best terms and at the highest return obtainable." 7 C.F.R. Sec. 981.66(a) (1993). The Board then distributes the proceeds from such disposition to the handlers on a pro rata basis. 7 C.F.R. Sec. 981.66(g) (1993). Alternatively, the handler may obtain authorization from the Board to act as the Board's agent in disposing of the reserve; all agents so authorized must sign agency agreements with the Board which contain "such reasonable terms and conditions, including inspection and certification requirements, as the Board may specify". 7 C.F.R. Sec. 981.67 (1993).
 
 
 102
 The agency agreements for the crop year 1990-91 contained a provision stating: "If established by the Secretary, minimum prices will apply to reserve almonds diverted to eligible outlets ... Agents will be notified of any such minimum price schedule established." Appellants contend that because the agency agreements include this provision, they violate both the Act and the APA.
 
 
 103
 (a) Agency agreements and the Act.
 
 
 104
 Appellants claim that the minimum price provision violates the Act because the Act forbids the fixing of prices with respect to almonds. This is incorrect; the Act is silent regarding whether agricultural marketing orders may set the prices that handlers receive from their customers.[16] The Act does state that almond marketing orders may provide for the establishment of reserve pools of almonds and provide "for the equitable distribution of the net return derived from the sale thereof among the persons beneficially interested therein." 7 U.S.C. Sec. 608c(6)(E) (1988). The Almond Marketing Order further provides that "[t]he Board shall have power and authority to sell or dispose of any and all reserve almonds withheld upon the best terms and at the highest return obtainable." 7 C.F.R. 981.66(a) (1993) (emphasis added). Because including minimum price provisions in agency agreements is consistent with this mandate, we hold that the agreements do not violate the Act.
 
 
 105
 (b) Agency agreements and the APA.
 
 
 106
 Appellants contend that the minimum price provision was an "additional regulation" requiring the Secretary to follow the APA's notice-and-comment procedure before adopting the agency agreements.[17] Appellants cite American Hosp. Ass'n v. Bowen, 834 F.2d 1037 (D.C.Cir.1987), in support of their argument. In American Hosp. Ass'n, the D.C. Circuit addressed the issue of whether the Department of Health and Human Services (HHS) had to subject certain of its contracts to APA notice and comment. As part of the Medicare program, HHS was required to contract with "peer review organizations" (PROs), private organizations of doctors that would monitor the professional activities of Medicare service providers in their areas. Id. at 1041. Congress granted HHS great discretion to contract with each PRO as it saw fit, in order to tailor the service review process to local needs. Id. at 1053. The statute provided specifically that
 
 
 107
 Contracting authority of the Secretary under this section may be carried out without regard to any provision of law relating to the making, performance, amendment or modification of contracts of the United States as the Secretary may determine to be inconsistent with the purposes of this part.
 
 
 108
 Id. (quoting 42 U.S.C. Sec. 1320c-2(e)). The D.C. Circuit held that this statutory language exempted HHS only from "the vast corpus of laws establishing rules regarding the procurement of contracts from the government," and did not exempt HHS from the "general restraints" of the APA. Id. at 1054. More specifically, the language did not "restor[e] a broad exemption from all APA requirements that would allow HHS on its own to modify vitally important provisions of peer review." Id. The court found that since Congress had granted HHS very broad discretion to implement the peer review program through individualized contracts with PROs, the danger of HHS' "legislating" the program through contractual terms was too high unless those terms were subject to APA notice and comment. Id. The court concluded that "any contract provisions that are legislative are subject to Sec. 553's notice and comment requirements." Id. (emphasis added).
 
 
 109
 We find the agency agreements to be distinguishable from the PRO agreements at issue in American Hosp. Ass'n. There, the central mechanism for implementing the entire peer review program was the PRO contracts, because Congress had mandated that HHS enter into such a contract with a PRO in each area. Thus, there was a real danger that HHS would assume the role of unelected legislative body and promulgate statutory law under the guise of PRO contract terms. Here, by contrast, the agency agreements are incidental to the administration of the Order; they simply give handlers another, perhaps preferable, option for disposing of their reserve almonds. Unlike the program at issue in American Hosp. Ass'n, USDA is not required to enter into agreements with handlers, nor is any individual handler required to enter into an agreement with USDA. Because the agreements are incidental to the entire program, and because handlers have another option, there is little danger that USDA will legislate through agency agreements.
 
 
 110
 Furthermore, even if the agency agreements did raise the dangers identified in American Hosp. Ass'n, the only provision that appellants specifically object to--the minimum price provision--is not "legislative" and thus would not be subject to APA procedures. The Act grants the Secretary the power to "provid[e] for the equitable distribution of the net return derived from the sale [of the reserve pool] among the persons beneficially interested therein." 7 U.S.C. Sec. 608c(6)(E) (1988). We held above that a minimum price provision is a legitimate means of enforcing this requirement; the provision is thus a "procedural" rule exempt from the APA's requirements. See American Hosp. Ass'n, 834 F.2d at 1055 ("procedural" rules, those that are "legitimate means of structuring [the agency's] enforcement authority," are exempt from the APA notice and comment requirement).
 
 
 111
 3. Restrictions on handlers' disposition of reserve almonds.
 
 
 112
 (a) Reserve almond storage requirements.
 
 
 113
 During the 1988-89 crop year, the Board informed handlers that their reserve almonds had to be stored in California. The Board instituted this requirement without following the procedural rule making requirements of the APA. Appellants argue that the California storage rule is a substantive rule that could have been promulgated only through compliance with the APA.
 
 
 114
 The Order grants the Board the power to "receive, investigate and report to the Secretary complaints of violations of [the Order]." 7 C.F.R. Sec. 981.38 (1993). To aid the Board in exercising this power, the Order also provides that "[e]ach handler's premises shall be accessible to authorized representatives of the Board and the Secretary for examination and audit of [certain] records and for inspection and observation of almonds." 7 C.F.R. Sec. 981.70 (1993). The California storage rule helped ensure such accessibility and was thus a "legitimate means of structuring [the agency's] enforcement authority." American Hosp. Ass'n, 834 F.2d at 1055. We hold that the California storage requirement, like the minimum price provision, was a "procedural" rule exempt from the APA notice-and-comment requirement.[18]
 
 
 115
 (b) Future sales contracts for reserve almonds.
 
 
 116
 The Order prohibits the "handling" of reserve almonds. 7 C.F.R. Sec. 981.50 (1993). The Order defines "to handle" as "to sell" or "to put into channels of trade." 7 C.F.R. Sec. 981.16 (1993). In December 1988 USDA sent out a letter stating that it considered a contract for the disposition of reserve almonds entered into before the release of the reserve to be a "sale" and thus a prohibited act of "handling." Effectively, then, USDA prohibited handlers from entering into contracts to sell reserve almonds.
 
 
 117
 Appellants contend that this letter was a rule that should have been promulgated pursuant to the notice and comment requirements of the APA. However, "interpretive" rules--"those which merely clarify or explain existing law or regulations"--are exempt from these requirements. Linoz v. Heckler, 800 F.2d 871, 877 (9th Cir.1986) (quotation omitted); 5 U.S.C. Sec. 553(b)(A) (1988). USDA's prohibition on the pre-release sale of reserve almonds is just such a rule, because it interprets the Order's prohibition on the handling of reserve almonds. The rule is therefore exempt from APA notice and comment.
 
 
 118
 4. Assessments on reserve almonds.
 
 
 119
 USDA currently imposes assessments on the total quantity of almonds received by handlers, including those in the reserve. Appellants contend that both the Act and the Order prohibit USDA from doing so.
 
 
 120
 We disagree. The Act states that each handler shall be assessed pro rata for reasonable Board expenses
 
 
 121
 other than expenses incurred in receiving, handling, holding, or disposing of any quantity of a commodity received, handled, held, or disposed of by such authority or agency for the benefit or account of persons other than handlers subject to such order.
 
 
 122
 7 U.S.C. Sec. 610(b)(2)(ii) (1988) (emphasis added). Appellants argue that the Board does not dispose of the reserve almonds "for the benefit of" the handlers and that therefore the Board cannot impose assessments on those almonds to cover the expenses of doing so. However, the proceeds from the Board's disposition of a handler's almonds are turned over to the handler. 7 U.S.C. Sec. 608c(6)(E) (1988); 7 C.F.R. Sec. 981.66(g) (1993). The reserve almonds are therefore disposed of "for the benefit" of the handlers, and the Board may consequently impose assessments on them.
 
 
 123
 We also reject appellants' contention that the Order prohibits the imposition of assessments on reserve almonds. The Order states that a handler shall only be assessed on almonds "received by him for his own account." 7 C.F.R. Sec. 981.81(a) (1993). All reserve almonds are originally "received" by handlers for their own account, and thus subject to assessment. Only after being received by handlers are a certain percentage of almonds then "held" for the account of the Board. Even then, they are not really held for the account of the Board in the sense of the Board's receiving the proceeds from the disposition thereof, because the handlers get those proceeds. This terminology and regulatory structure is admittedly somewhat ambiguous, but "where Congressional intent is ambiguous, courts should defer to a reasonable agency interpretation of a statutory scheme the agency is entrusted to administer." Railway Labor Executives' Ass'n v. I.C.C., 958 F.2d 252, 256 (9th Cir.1991). We defer to USDA's reasonable interpretation of the Order.
 
 IV. THE ADMINISTRATIVE REMEDY PROCEDURE
 
 124
 Appellants finally contend that the long and tortuous path they have had to follow to exhaust their claims violates their right to due process. While we understand appellants' frustration with the administrative remedy procedure, we must also reject their argument. Appellants claim that the procedure does not provide petitioners with a "clear and certain remedy;" however, we have already held that a sufficient remedy for handlers who prevail in their administrative petitions is a refund of any assessments found not to have been due. Saulsbury Orchards, 917 F.2d at 1195 (quoting Navel Orange Admin. Comm. v. Exeter Orange Co., 722 F.2d 449, 452 (9th Cir.1983)).[19] As for the amount of time appellants have spent pressing their claims, we agree with the district court's reasoning that[w]hile there is no question that completion of the administrative process in connection with this Section 15(A) petition was very lengthy, it is also apparent that some of the delay resulted from the sheer number and magnitude of the issues raised in the petition as well as from the litigation tactics adopted by plaintiffs ... [T]he court thinks it unrealistic of plaintiffs to expect prompt resolution of the quality and quantity of issues raised herein.
 
 
 125
 The length of the proceedings, although certainly regrettable, was not a denial of due process.
 
 V. CONCLUSION
 
 126
 We affirm the judgments for USDA on all issues except the almond marketing program, which we find to violate the First Amendment. We are now faced with the question of what remedy to grant to appellants. Appellants request a full refund of the assessments imposed upon them from 1980 to the present, as well as attorneys' fees and costs pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. Sec. 2412. Because of the fact-intensive nature of the inquiry, we find that "[t]he determination of the appropriate remedy in this case is a matter that should be addressed in the first instance by the District Court." Chicago Teachers Union v. Hudson, 475 U.S. 292, 310, 106 S.Ct. 1066, 1078, 89 L.Ed.2d 232 (1986). See also Ellis v. Brotherhood of Ry. Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The case is remanded for further proceedings consistent with this opinion.
 
 
 127
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 A handler may receive credit against his assessment in an amount not to exceed "that portion of his assessment designated for marketing promotion including paid advertising." 7 C.F.R. Sec. 981.41(c) (1993). For example, for the 1986-87 crop year, the overall assessment was 2.6cents per pound, and the maximum credit was 2.5cents per pound
 
 
 [2]
 The Act provides that handlers may receive credit "for such marketing promotion including paid advertising as may be authorized by the [O]rder." 7 U.S.C. Sec. 608c(6)(I) (1988). The Order authorizes the Board, with the approval of the Secretary, to provide "for crediting all or any portion of a handler's direct expenditures for marketing promotion including paid advertising, that promotes the sale of almonds, almond products, or their uses." 7 C.F.R. Sec. 981.41(c) (1993)
 
 
 [3]
 Saulsbury, believing that it would suffer irreparable injury if it were forced to exhaust its administrative remedies, also filed a complaint in district court, again alleging that the Order was unconstitutional. The district court again dismissed the action on the ground that Saulsbury had failed to exhaust its administrative remedies. Saulsbury, 917 F.2d at 1193. We affirmed the dismissal in Saulsbury. Id. at 1197
 
 
 [4]
 Handlers may also earn credits by engaging in other promotional activities, such as distributing sample packages of almonds to charitable or educational outlets, purchasing promotional materials available from the Board, or certain direct mail promotions. 7 C.F.R. 981.441(d)(1)(i)-(iii) (1993). The availability of such options does not change the First Amendment analysis; they simply represent other types of expressive activity the only alternative to which is the compelled assessment. In practice, the "vast majority" of creditable advertising expenditures are spent on advertisements and not on these alternatives
 
 
 [5]
 "Commercial speech" is that which "propose[s] a commercial transaction." Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986) (quotation omitted). All of the promotional efforts undertaken by the Board, whether directly (through its own activities) or indirectly (through the inducements of the creditable advertising regulations), are aimed at increasing almond sales. The program therefore deals with commercial speech
 
 
 [6]
 Roger Baccigaluppi, the president and chief executive officer of Blue Diamond, testified that a professor at the University of California-Davis had conducted a study whose results demonstrated that the advertising program had been successful in increasing grower returns. However, this study is not part of the record
 
 
 [7]
 USDA asserts that creditable advertising may "reasonably be expected to increase the sale of almonds," Brief for the Appellee at 31, and cites to the rule-making records underlying the regulations to support its assertion. However, these records address only minor amendments to the regulations made during the past decade, and not to the initial adoption of the bulk of the regulations, including the most restrictive ones. See, e.g., 49 Fed.Reg. 19,978 (May 10, 1984) (increasing the amount of credit handlers receive for advertising almond butter); 50 Fed.Reg. 16,451 (April 26, 1985) (doubling the portion of creditable advertising that may be carried over from one crop year to the next); 52 Fed.Reg. 13,427 (April 23, 1987) (allowing credit for the cost of purchasing mailing lists, envelopes and postage used in mail order promotions)
 
 
 [8]
 For example, in 1987 Cal-Almond spent nearly $300,000 advertising the business but its gross mail order sales were less than $100,000
 
 
 [9]
 As of July 1987, Blue Diamond had a 92 percent share of almonds sold in grocery stores
 
 
 [10]
 Once again, appellants have presented evidence to the contrary. Cloyd Angle, the president of Cal-Almond, testified that the best way for him to sell almonds is to bring potential customers to his plant and show them the cleanliness and efficiency of his processing facilities. Spending money on generic Board promotion does not help him do this
 
 
 [11]
 The Frame majority held that mandatory assessments to the Cattlemen's Board advanced the goals of the Beef Promotion Act because they "prevent[ed] 'free riders' from receiving the benefits of the promotion and research program without sharing the cost." Frame, 885 F.2d at 1135. USDA could make a similar argument here (although it has not). Such a conclusion, however, presumes that the promotion itself advances the goals of the Act, a presumption that we have rejected
 
 
 [12]
 Outlined in section I.A. above
 
 
 [13]
 The Board recommended assessment rates at the annual July meeting. However, in the years from 1980 to 1986, the earliest the Secretary issued the final rule was August 26 in 1980, and the latest was October 19 in 1982
 
 
 [14]
 The cases cited by appellants address the adequacy of agency explanations of the contents of their rules, not the delays in promulgating them. See, e.g., North Germany Area Council v. Federal Labor Relations Auth., 805 F.2d 1044 (D.C.Cir.1986); Celcom Communications Corp. v. F.C.C., 789 F.2d 67 (D.C.Cir.1986)
 
 
 [15]
 The following example is illustrative:
 Many commenters who opposed the 35 percent reserve indicated that there is an over production of California almonds and that holding almonds in reserve this year will add to the surplus in following years. Over the past decade, however, annual marketable production has failed to meet trade demand needs for the 1983-84, 1985-86, 1986-87, and 1989-90 crop years. Given the wide swings in production from year to year which characterize the almond industry, it is possible that the 1991 crop could fall short of 1991-92 trade demand needs. If early projections of the 1991 crop indicate that this would likely be the case, an appropriate quantity of 1990-91 crop year reserve almonds would be released to the salable category to augment 1991-92 crop year supplies.
 
 
 [55]
 Fed.Reg. 38,793, 38,794 (1990)
 
 
 [16]
 Appellants quote our observation in Pescosolido v. Block, 765 F.2d 827 (9th Cir.1985), that "the Secretary is not empowered to fix prices for any [commodities other than milk] covered by the Act." Id. at 830. Pescosolido is inapplicable to the present case because it dealt with the prices that handlers pay to producers, not the prices that handlers receive from their customers
 
 
 [17]
 Agency agreements are contracts, and the APA does not apply to matters "relating to agency management or personnel or to public property, loans, grants, benefit, or contracts." 5 U.S.C. Sec. 553(a)(2) (1988) (emphasis added). In 1971, however, USDA promulgated a regulation making the APA's procedural requirements applicable to all of its rule making relating to contracts. 36 Fed.Reg. 13,804 (1971)
 
 
 [18]
 While storing almonds in California may have inconvenienced appellants, the mere fact that a rule may have a substantial impact "does not automatically transform it into a legislative rule." State ex rel. State Water Resources Control Bd. v. Federal Energy Regulatory Comm'n, 966 F.2d 1541, 1554 (9th Cir.1992) (quotation omitted)
 
 
 [19]
 Contrary to appellants' contention, the Supreme Court's holding in McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), does not require the remedy to consist of compensatory damages. The Court held only that an appropriate remedy for taxes unlawfully collected from plaintiff could either be a refund of taxes unlawfully collected or an assessment and collection of back taxes from the plaintiff's competitors. Id. at 40, 110 S.Ct. at 2252. McKesson never held that compensatory damages were required; it held only that a refund of unlawful taxes was one possible way for the State to satisfy the requirements of the Due Process Clause