# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON TROLLERS ASSOCIATION;
SUISLAW FISHERMEN'S ASSOCIATION;
THOMAS HARRIS; JAMES MOORE; JIM
GAGNON; JOHN FRASER; GARTH
PORTEUR; STAN JONES; RUSSELL
OTT; DONALD JACOBS; GREAT
AMERICAN SMOKEHOUSE AND
SEAFOOD COMPANY; CAP'N ZACH'S
CRAB HOUSE; ZACK ROTWEIN; PAT
HOUCK; DAN MORRIS,
            *Plaintiffs-Appellants,*

                v.

CARLOS M. GUTIERREZ, Secretary
of the United States Department of
Commerce; NATIONAL MARINE
FISHERIES SERVICES; WILLIAM T.
HOGARTH, NMFS Director; D.
ROBERT LOHN, NMFS Regional
Director for the Northwest Region,
            *Defendants-Appellees,*

YUROK TRIBE; HOOPA VALLEY
TRIBE,
            *Defendants-Intervenors-*
                    *Appellees.*

No. 05-35970

D.C. No.
CV-05-06165-TMC

OPINION

Appeal from the United States District Court
for the District of Oregon
Thomas M. Coffin, Magistrate Judge, Presiding

Argued and Submitted
May 1, 2006—Portland, Oregon

7383

Filed July 6, 2006

Before: John T. Noonan, A. Wallace Tashima, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Russell C. Brooks, Pacific Legal Foundation, Bellevue, Washington; Ross Day, Oregonians in Action Legal Center, Tigard, Oregon, for the appellants.

Mark R. Haag, U.S. Department of Justice, Washington, D.C., and James L. Sutherland, Office of the U.S. Attorney, Eugene, Oregon, for the appellees.

Rob Roy Smith, Morisset Schlosser Jozwiak & McGaw, Seattle, Washington, and Scott W. Williams, Curtis G. Berkey, Alexander Berkey Williams & Weathers, Berkeley, California, for the defendants-intervenors-appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

The 250-mile Klamath River originates in eastern Oregon and empties into the Pacific Ocean at Crescent City, California. The Klamath River fall chinook, an anadromous salmon species, begin life in the river's upper reaches and tributaries, either in hatcheries or in the wild. As juveniles the Klamath chinook migrate to sea and spend much of their lives in the Klamath Management Zone, an area off the coasts of California and Oregon. At age 3, 4, or 5, they return, usually to their natal tributaries or hatcheries, to spawn and die.

In early 2005, the National Marine Fisheries Service ("NMFS") projected that a critically low number of Klamath chinook would escape that season's harvest to survive and to spawn in the wild. To increase the projected number of wild-spawning Klamath chinook, the NMFS adopted fishery management measures that substantially limited commercial and, to a lesser extent, recreational fishing in the Klamath Management Zone for 2005.

Plaintiffs, who include fishermen, fishing-related businesses, and fishing organizations, filed this action against the NMFS and other governmental entities to challenge the 2005 management measures. Plaintiffs allege that the measures conflict with a number of substantive and procedural requirements set forth in the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1801 *et seq.* The district court granted summary judgment to defendants, and we affirm.

## I.  Introduction

The events at issue in this dispute unfolded in early 2005 against a complicated regulatory backdrop. We first describe

in general terms the regulation of Pacific fisheries under the Magnuson Act. We then turn to the specific facts of this case.

## A.   Regulatory Background

### 1.   The Magnuson Act and Fishery Management Plans

Congress passed the Magnuson Act in 1976 in order "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States . . . ." 16 U.S.C. § 1801(b)(1). The statute established eight Regional Fishery Management Councils, including the Pacific Fishery Management Council ("PFMC" or "the Council"). *Id.* § 1852(a)(1)(F). The councils, composed of federal and state officials as well as private experts appointed by the NMFS, draft "fishery management plans" ("FMPs"), *id.* § 1852(h)(1), that are designed to "achieve and maintain, on a continuing basis, the optimum yield from each fishery[.]" *Id.* § 1801(b)(4). The councils also propose regulations implementing these FMPs to the Secretary of Commerce. *Id.* § 1853(c). Acting through the NMFS, the Secretary reviews FMPs and their implementing regulations for consistency with the Magnuson Act, solicits public comment, and publishes final regulations in the Federal Register. *Id.* § 1854(a)(1)(B), (b)(1).

### 2.   The Pacific Coast Salmon Plan

In 1977, the NMFS approved the Pacific Coast Salmon Plan ("Pacific Plan"), an FMP for the Pacific salmon fisheries. *See* Pacific Plan 1 (revised Sept. 2003), *available at* http://www.pcouncil.org/salmon/salfmp.html.[1]  From   1978 through 1983, the Council recommended annual amendments to the Pacific Plan based on yearly "salmon abundance estimates and social and economic factors affecting the fish-

---

[1]All PFMC documents we refer to are available at the Council's website, http://www.pcouncil.org.

eries." 49 Fed. Reg. 43679, 43679 (Oct. 31, 1984). This process, which required notice-and-comment and other procedures, proved "too cumbersome to allow for timely implementation of the annual regulations and efficient fishery management." Pacific Plan at 1. In 1984, the Council therefore proposed a "comprehensive framework amendment" to the NMFS. Pacific Plan at 1. The 1984 amendment established consistent terms for salmon regulation that would apply every year, and it provided a "mechanism for making preseason and inseason adjustments in the regulations without annual amendments to the FMP." 49 Fed. Reg. at 43679. Shortly thereafter, the NMFS approved the amended Pacific Plan and promulgated implementing regulations, now codified at 50 C.F.R. §§ 660.401-411.

The amended Pacific Plan includes fixed measures, which can only be changed through formal rulemaking, and allows for flexible measures, which change from year-to-year based on fishery conservation and management needs. *See Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1243 (9th Cir. 1988). "Fixed measures" include "the procedures and schedules for making preseason and inseason adjustments to the regulations." "Flexible measures" include "determinations of the annual allowable levels of ocean harvests . . . ." 49 Fed. Reg. 32414, 32414-15 (Aug. 14, 1984) (proposed rule).

One of the most important features of the Pacific Plan's management of Klamath chinook is its "spawning escapement goal." "For natural stocks, the escapement goal is defined as the number of spawning adults needed to produce the maximum number of juvenile salmon that, after incubation and freshwater rearing, will out-migrate to the sea . . . . For hatchery stocks, the escapement goal is that number of spawners needed to meet a hatchery's agreed-upon artificial production plan." *United States v. Washington*, 774 F.2d 1470, 1473 n.2 (9th Cir. 1985). The NMFS first adopted a spawning escapement goal for the Klamath chinook in 1985. It required the agency to design annual management measures such that, by

1998, 115,000 Klamath chinook, including 97,000 natural spawners, would escape to spawn. *See* 50 Fed. Reg. 812, 813 (Jan. 7, 1985).

In December 1988, the Council, "[f]aced with declining run sizes," proposed an amendment to the Pacific Plan that would set the escapement goal at "35 percent of the potential adults from each brood of natural spawners, but no fewer than 35,000 naturally spawning adults in any given year." Hatchery spawners would not count toward this goal. The NMFS adopted this amendment to the Pacific Plan and implemented it in a regulation promulgated on May 4, 1989. The regulation has remained in effect, with minor adjustments, since then. *See* 54 Fed. Reg. 19185, 19194 (May 4, 1989); 54 Fed. Reg. 19798, 19800 (May 8, 1989) (lowering the percentage to 33-34%).

### 3.   Annual Management Measures

The process for setting the "flexible" annual management measures for Pacific salmon fisheries begins in January, when the Council releases a report describing abundance levels for the previous year's salmon stocks. *See* PFMC, *Council Operating Procedure: Preseason Mgmt. Process* (rev. Mar. 11, 2005). In February, the Council drafts Preseason Report I, which makes "stock abundance forecasts and harvest and escapement estimates [for the coming season] when recent regulatory regimes are projected on current year abundance." *Id.* In early March, the Council meets in public to discuss various management options for the coming season in that year. It then releases Preseason Report II, which proposes "not more than three alternative regulatory options" to meet "FMP management objectives." *Id.* The Council holds public meetings on the proposed salmon management options in late March. After receiving comments from the public, the Council chooses from among the options at its early April meeting. Most of that meeting is open to the public. *See* Pacific Plan at 9-1. The Council then forwards its proposed management

measures to the NMFS for final approval. Annual management measures for the Pacific salmon fisheries are published in final form in the Federal Register in early May.

B.    Klamath Chinook and 2005 Management Measures

Klamath River salmon have suffered dramatically in recent years. In the spring of 2002, thousands of juvenile salmon died in the river before reaching the ocean. That fall, 34,000 mature chinook, coho, and steelhead died in the river's lower 20 miles as they tried to swim upstream. The proliferation of a salmon parasite, exacerbated by low water levels caused by drought and irrigation use, may have caused this mass fish kill. *See* U.S. Fish & Wildlife Serv., *Klamath River Fish Die-Off September 2002: Causative Factors of Mortality*, Exec. Summary at ii (Nov. 2003), *available at* http://www.fws.gov/sacramento/ea.

Problems continued in 2004 and 2005. In its *Review of 2004 Ocean Salmon Fisheries*, published in early 2005 ("2004 Review"), the Council reported that the Klamath River run after the 2004 fishing season consisted of 79,000 returning adult chinook, or about 20,000 fewer than its preseason estimate. Of these, only 24,300 were natural spawners. *2004 Review* at 35. Predictions for the 2005 postseason run, when juvenile salmon that had survived the 2002 die-off would return to spawn, were even more dire. Preseason Report I, released in February 2005, concluded that "a repeat of [the 2004 management measures] would be expected to result in fewer than 35,000 natural area adult spawners, and thus, fail to meet the minimum spawner requirement." *2005 Preseason Report I* at 23.

The Council met from March 6 to 11, 2005, to develop proposed options for annual management measures under the Pacific Plan. These proposals appeared in Preseason Report II. Each proposal recommended drastically restricted fishing in the Klamath Management Zone.

After public hearings in late March, the Council met in early April to adopt its final 2005 recommendations. On the table was a proposal to lower the 35,000 natural spawner escapement floor for Klamath chinook by 3,000 fish in order to spare fishermen a highly restricted season. The proposal was seriously considered by the Council. One councilmember observed that "[m]anaging below the floor could result in overfishing and would require [an] emergency rule." Another insisted that "the risk of reducing the escapement by 3,000 fish was minimal," while a third stated that, in his view, the risk "was worth the potential economic benefit to the fisheries." A fourth councilmember responded that "the management doctrine for the Klamath system was based on the Council's Salmon FMP." "[I]f the Council moved away from its mandates," he argued, "it would contribute to the problems in the Klamath system, which was not in the long-term interest of the Council and the fishermen." The motion to recommend a lowered escapement floor for Klamath chinook natural spawners from the 35,000 number established in 1989 failed by a vote of 7 to 7.

The Council formally proposed its 2005 management measures in Preseason Report III, released shortly after the April meeting. The report acknowledged that its recommended "commercial fishery measures" for the Klamath Management Zone "are substantially more restrictive than in 2004." *2005 Preseason Report III* at 2. For example, commercial fishing in the Oregon portion of the Klamath Management Zone would be closed for all of May, June, July, and August. *Id.* at 3. The Report also acknowledged that recommended "recreational fishery measures are somewhat more restrictive than in 2004." *Id.*

The Council forwarded its proposed management measures to the NMFS. An April 22 NMFS memorandum observed that "during the process of developing final management recommendations for 2005 there was controversy relating to achievement of the Klamath River fall Chinook escapement

floor of 35,000 . . . ." It noted that some commercial fishermen had appeared at the April Council meeting to propose that it "consider increasing harvest beyond what was developed" in Preseason Report II. The memorandum recognized that approval of this proposal would have resulted in returning Klamath River chinook natural spawners below the 35,000 fish floor, and stated that "an emergency rule would have been required" to allow for this deviation from the 1989 regulation amending the Pacific Plan. Another NMFS memorandum observed that the restricted season recommended by the Council would yield an expected $33.7 million in income for Pacific salmon fisheries, "down 28% from the 2004 value of $46.8 million, and 74% below the 1976-1990 average."

Declaring that projected shortfalls in numbers of returning salmon made "certain reductions" necessary "in order to achieve the conservation objective of 35,000 natural Klamath River fall Chinook adult spawners," the NMFS adopted the Council's recommendations without change in an action published in the Federal Register on May 4, 2005. 70 Fed. Reg. 23054, 23055 (May 4, 2005). The NMFS did not open a public comment period before publishing its action. Rather, it invoked the Administrative Procedure Act's ("APA") "good cause" exception based on the need to get the action finalized before opening of the fishing season. *See* 5 U.S.C. § 553(b)(B).

There is little doubt that the restricted salmon fishing season under the 2005 management measures imposed significant hardship on Pacific fishing communities. One estimate pegged the loss caused to commercial fishermen and related businesses at $40 million. *See* Stacy Finz & Glen Martin, *Imagine a Year Without Local Salmon*, S.F. Chron., Mar. 3, 2006, at A1. Several of the individual plaintiffs in this suit attested to the threats the 2005 management measures posed to their livelihoods.

### C. Proceedings Below

Plaintiffs commenced this suit within 30 days of the publication of the 2005 management measures in the Federal Register. Their suit has two parts. First, and most important, they object to the 1989 regulation establishing the 35,000 natural spawner escapement floor for Klamath chinook, under which the 2005 action was taken. Second, they object to the 2005 action on several bases that are independent of the 1989 regulation.

The Hoopa Valley and Yurok Tribes, whose reservations straddle the Klamath River and its tributaries, intervened in support of the NMFS. In a thorough and carefully reasoned opinion, the district court granted the defendants' motion for summary judgment. *See generally Oregon Trollers Ass'n v. Gutierrez*, Civ. No. 05-6165, 2005 U.S. Dist. LEXIS 34084 (D. Or. Sept. 8, 2005). The court concluded that plaintiffs' attacks on the 1989 regulation establishing the 35,000 natural spawner escapement floor were barred by the 30-day limitations period of the Magnuson Act. *See* 16 U.S.C. § 1855(f)(1). In the alternative, the district court rejected plaintiffs' claims on the merits, holding that the escapement floor reflected "an eminently reasonable consideration when managing a fishery to maintain its long-term viability." 2005 U.S. Dist. LEXIS 34084, at *31. The district court also upheld the 2005 management measures against plaintiffs' other objections.

On appeal, plaintiffs challenge every aspect of the district court's decision. We disagree with the district court's conclusion that the plaintiffs' attack on the 1989 regulation is barred by the thirty-day statute of limitations contained in 16 U.S.C. § 1855(f)(1). However, we agree with the district court on the merits. We therefore affirm.

### II. Statute of Limitations

We review a district court's statute of limitations determination de novo. *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d

1122, 1127 (9th Cir. 2006). As originally drafted, the Magnuson Act provided that a plaintiff was required to bring suit to challenge a "regulation" within 30 days of its promulgation. Pub. L. No. 94-265, Title III, § 305(d), 90 Stat. 354 (1976). Congress amended this limitations period in 1990. As now set forth in § 1855(f), it reads as follows:

> (1)  Regulations promulgated by the Secretary under this chapter *and actions described in paragraph (2)* shall be subject to judicial review . . . if a petition for such review is filed within 30 days after the date on which the regulations are promulgated *or the action is published in the Federal Register . . .*
>
> (2)  *The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.*

16 U.S.C. § 1855(f) (emphasis added to indicate language added by 1990 amendment).

Three of plaintiffs' six causes of action challenge the 35,000 natural spawner escapement floor as inconsistent with the Magnuson Act. The NMFS added the escapement floor to the Pacific Plan and its implementing regulations in 1989. Defendants contend that under § 1855(f)(1) plaintiffs should have filed their challenge within thirty days of the promulgation of that regulation, and that their suit is therefore sixteen years too late. Plaintiffs in response argue, inter alia, that the 1990 amendment to § 1855(f)(1) renders their challenge to the 1989 regulation timely. For the reasons given below, we agree with plaintiffs.

[1] Before 1990, the Magnuson Act only allowed judicial review of "regulations." A challenge to a "regulation" had to

be filed within thirty days of its promulgation. If § 1855(f)(1) were still in its original form, plaintiffs' claim, brought in June 2005, would be clearly time-barred because the NMFS promulgated the regulation implementing the 35,000 natural spawner escapement floor on May 4, 1989. *See* 54 Fed. Reg. at 19194.

The Fourth Circuit addressed the pre-1990 version of § 1855(f)(1) in *Kramer v. Mosbacher*, 878 F.2d 134 (4th Cir. 1989). There, the Secretary of Commerce promulgated a regulation establishing a 2.6 million pound limit for the 1988-89 king mackerel season on July 8, 1988. On October 14, 1988, the Secretary declared that king mackerel were overfished and announced that he would close the recreational fishing season on October 17. On November 18, he announced that the commercial fishing season would close on November 23. On November 10, plaintiffs sued to compel the Secretary to double the total allowable catch of 2.6 million pounds for the 1988 season. *Id.* at 135. They argued that the 30-day limitations period for challenging 2.6 million pound limit did not commence until October 14, when the Secretary announced his intention to close the fishery, rather than on July 8, when he adopted the underlying regulation setting the total catch limit. *Id.* at 137.

The Fourth Circuit concluded that "the thirty day limit commences at the time the regulations are published and that this limit is to be strictly construed." 878 F.2d at 137. The court held that "the Secretary is *required* by the regulations to close a fishery when its quota is reached . . . . As a result, catch limits are in fact put into operation on the date of the regulation's publication, and not at some later time." *Id.* (citation omitted) (emphasis in original). Because the suit was filed four months after the regulation's promulgation on July 8, the court concluded that it was untimely. *Id.*

Our case mirrors *Kramer*. If we were to apply § 1855(f)(1) as it existed before its 1990 amendment, we would conclude

that the statute of limitations for challenging the regulation establishing the 35,000 natural spawner escapement floor expired in June of 1989, thirty days after the promulgation of that regulation. However, Congress amended § 1855(f)(1) in 1990 specifically in order to change the result in *Kramer*. *See* Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 111, 104 Stat. 4436, 4452-53. The House Report makes this intention plain, stating that the 1990 amendment "is a direct response to a portion of the decision of the Fourth Circuit Court of Appeals in *Kramer* . . . ." H.R. Rep. No. 101-393, at 28 (1990).

**[2]** The text of the amended § 1855(f)(1) provides that a plaintiff may challenge both an action and a regulation under which the action is taken so long as the suit is filed within thirty days of the action's publication in the Federal Register. Section 1855(f)(1) states that "[r]egulations . . . *and* actions . . . shall be subject to judicial review" if a petition for review is filed "within 30 days after the date on which the regulations are promulgated *or* the action is published in the Federal Register[.]" The conjunctive "and" — italicized above — indicates that both regulations *and* actions are reviewable in a timely filed petition. *See Dawson v. City of Seattle*, 435 F.3d 1054, 1063 (9th Cir. 2006) (describing the plain meaning of "and"). The disjunctive "or" — also italicized above — indicates that a petition is timely if it is filed within thirty days of either promulgation of the regulation *or* publication of the action. *See United States v. Tucor Int'l, Inc.*, 238 F.3d 1171, 1179 (9th Cir. 2001) (interpreting the plain meaning of "or"). Thus, as a straightforward textual matter, a petition filed within 30 days of the publication of an action may challenge both the action and the regulation under which the action is taken.

If additional evidence were needed, the legislative history of the 1990 amendment makes clear that this reading reflects the intent of Congress. The Senate Report accompanying the amendment stated that an affected party is unlikely to chal-

lenge a regulation until the regulation has a discernable practical application — that is, until the agency takes an action under the regulation that has a material adverse effect on that party. The short limitations period in the pre-1990 statute, however, made such challenges untimely:

> [A] substantial period may lapse between the time a regulation to implement a fishery management plan is published and the time action is taken by the Secretary pursuant to the regulation. In many instances, it is only when such an action is taken that participants in the fishery can assess whether a petition for judicial review is necessary. The time lapse between publication o[f] a regulation and Secretarial action may deny individuals the opportunity *to challenge regulations* at the point in time when they can determine that such a challenge is necessary.

S. Rep. No. 101-414, *reprinted in* 1990 U.S.C.C.A.N. 6276, 6298 (emphasis added). According to the Report, the 1990 amendment would remedy this problem by "allow[ing] a challenge within 30 days of the time that a Secretarial action is published." *Id*.

The House Report made the same point:

> Under current law, a management plan or regulation can only be challenged in court within 30 days after publication in the Federal Register. Since some management regulations are prospective, this prevents interested parties from challenging those regulations at the time they are actually implemented. The amendments made by this subsection will allow a challenge within 30 days of the time that a regulation is implemented.

H. R. Rep. No. 101-393, at 28 (1990). The amendment's sponsor in the House, Representative Jones, added his voice

to this chorus. He stated that the amendment would "permit[ ] suit" to challenge a regulation "either when initial management plan regulations are issued or when implementing actions are put into effect." 136 Cong. Rec. H229-06, H240 (Feb. 6, 1990) (statement of Rep. Jones).

**[3]** Plaintiffs filed suit within thirty days of the publication of the 2005 management measures. Under our reading of § 1855(f) as amended, the publication of these measures was an "action" within the meaning of the statute. Therefore, plaintiffs had thirty days to attack both the action and the 1989 regulation under which the action was taken. The government makes three arguments to avoid this result. None is persuasive.

First, the government argues that plaintiffs waived an argument based on the 1990 amendment to § 1855(f)(1) because they never raised it in the district court. This is not, strictly speaking, true. Plaintiffs did raise this argument, although they did so only during oral argument on summary judgment. To the extent that we need to exercise our discretion to address this otherwise tardy argument, we are willing to exercise it in this case. Because plaintiffs' argument raises a purely legal issue whose resolution requires no further factual development, and because the issue would otherwise reappear in identical form the next time plaintiffs challenge annual management measures, we believe it appropriate to address this issue now. *See A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 339 (9th Cir. 1996).

Second, the government argues that our earlier holding in *Norbird Fisheries, Inc. v. Nat'l Marine Fisheries Serv.*, 112 F.3d 414 (9th Cir. 1997), compels us to hold that plaintiffs' challenge to the 1989 regulation is untimely. The government has misread our analysis in *Norbird*. The entirety of our analysis of § 1855(f)(1) in that case was as follows:

> Regulations promulgated by the Secretary under the
> Magnuson Act are "subject to judicial review" in

accordance with the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated." 16 U.S.C. § 1855(f)(1). A separate section of the Magnuson Act confers jurisdiction on the district court "over any case or controversy arising under the provisions of this chapter." 16 U.S.C. § 1861(d). This latter provision is to be read in conjunction with the provision governing judicial review of the regulations. That provision, § 1855(f)(1), deprives the district court of jurisdiction to hear an attack on the regulations if review is not sought within 30 days of their promulgation. *Kramer v. Mosbacher*, 878 F.2d 134, 136-37 (4th Cir. 1989).

112 F.3d at 416. As this passage shows, our analysis in *Norbird* focused only on a challenge brought to a "regulation" under § 1855(f)(1). It did not address a challenge brought to an "action," as distinct from a "regulation." Our citation to *Kramer* underscores this exclusive focus on a "regulation." The 1990 amendment to § 1855(f)(1), specifically designed to overrule the Fourth Circuit's decision in *Kramer*, relaxed the statute of limitations by allowing a challenge to an "action" taken under a "regulation." We did not analyze in *Norbird* the new provision in § 1855(f)(1) allowing challenges to an "action."

Third, and finally, the government argues that plaintiffs' challenge to the 2005 management measures is a challenge to a "regulation," not to an "action." The government has misunderstood the meaning of "action" as that term is used in § 1855(f)(1) and defined in § 1855(f)(2). "Actions" are defined in § 1855(f)(2) as "actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational

fishing." There can hardly be a better fit between the 2005 management measures and this definition.

The 2005 management measures "establish the date of closure of a fishery to commercial or recreational fishing" by closing both commercial and recreational fishing for specified periods in specified areas in the Klamath Management Zone. Moreover, the 2005 management measures "are taken . . . under [a] regulation[ ] which implement[s] a fishery management plan." The regulations implementing the Pacific Plan are set forth at 50 C.F.R. §§ 660.401-411. The regulation in question — the 1989 amendment to the Pacific Plan adding the escapement floor — was initially (and for several years thereafter) expressly included in the Code of Federal Regulations. *See* 50 C.F.R. § 661 Appx. pt. IV(a) (1989); 50 C.F.R. § 660.410(a) (1996). In 2000, the express mention of the 35,000 natural spawner escapement floor was removed from the code, *see* 65 Fed. Reg. 63047, 63050 (2000), but it remains incorporated by reference. 50 C.F.R. § 660.410(a) (2005) (providing that "conservation objectives are summarized in Table 3-1 of the Pacific Coast Salmon Plan"); Pacific Plan at 3-9 (Table 3-1, describing 35,000 natural spawner escapement floor). Thus, the escapement goal is part of the regulations that implement the FMP at issue.

The NMFS adopted the 2005 management measures by following the process the Pacific Plan's implementing regulations prescribes for "actions." Section 660.408, entitled "Annual actions," provides that the "NMFS will annually establish . . . management specifications . . . by publishing *the action* in the Federal Register under § 660.411." 50 C.F.R. § 660.408(a) (emphasis added). That section further states that "[m]anagement specifications are set forth in paragraphs (b) through (n) of this section." *Id.* Paragraph (h) is entitled "Seasons" and provides, in part, that "[c]ommercial seasons will be established or modified taking into account . . . protection of depressed stocks present in the fishing areas." *Id.* § 660.408(h)(2). Thus, management measures that set a sea-

son's length are "management specifications," which in turn are "actions."

Finally, the NMFS finalized and published the 2005 management measures pursuant to § 660.411, the mechanism specified in § 660.408 for the publication of "actions." Section 660.411 states that "[a]nnual and certain other *actions* . . . will be implemented by an *action* published in the Federal Register . . . ." 50 C.F.R. § 660.411(a) (emphasis added). The regulation sets forth a "good cause" exception to the notice-and-comment requirement that otherwise applies to "any action." *Id.* § 660.411(b). When it published the 2005 management measures in the Federal Register, the NMFS invoked § 660.411 and its "good cause" exception. *See* 70 Fed. Reg. at 23063.

It is not our job to determine whether the statute of limitations, as it now operates under § 1855(f)(1), is unwise, unfair, or unworkable. That job belongs to Congress. Our task is to interpret the statute. Applying our reading of its plain terms, the 2005 management measures' publication triggered a 30-day period during which plaintiffs could challenge the 1989 regulation establishing the 35,000 natural spawner escapement floor.

## III. Merits

### A. Standard of Review

We now turn to the merits of plaintiffs' claims. We review the NMFS's construction of the Magnuson Act under the familiar test set forth in *Chevron, U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). *See NRDC, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 878 (9th Cir. 2005). We first consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Con-

gress." *Chevron*, 467 U.S. at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. So long as the agency's construction is reasonably consistent with the statute, we defer to it. *Id.*; *see also Pronsolino v. Nastri*, 291 F.3d 1123, 1131 (9th Cir. 2002). This test is satisfied if the agency's interpretation "reflects a plausible construction of the statute's plain language and does not otherwise conflict with Congress' expressed intent." *Rust v. Sullivan*, 500 U.S. 173, 183 (1991).

The Magnuson Act adopts the APA's standard for judicial review of agency action set forth in 5 U.S.C. § 706(2)(A). 16 U.S.C. § 1855(f)(1). We set aside an agency's regulations if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).

## B.    Attacks on the 1989 Regulation

Three of plaintiffs' six claims attack the 1989 regulation establishing the 35,000 natural spawner escapement floor. Plaintiffs claim (1) that the regulation is inconsistent with the Magnuson Act's definition of a "stock of fish" under 16 U.S.C. § 1802(37); (2) that it is inconsistent with the "national standard" under 16 U.S.C. § 1851(a)(2) requiring that management measures "be based upon the best scientific information available;" and (3) that it is inconsistent with the "national standard" under 16 U.S.C. § 1851(a)(3) requiring that, "[t]o the extent practicable, an individual stock of fish shall be managed as a unit." We address these claims in turn.

### 1. "Stock of Fish" under the Magnuson Act

Plaintiffs' primary claim is that the Magnuson Act forbids the NMFS to distinguish between natural and hatchery spawners for the purposes of Klamath chinook management and conservation. In the view of plaintiffs, the NMFS must count hatchery spawners towards any escapement goal for Klamath chinook. If this were required, an escapement goal would be satisfied much more easily with less restrictive management measures. The practical impact of their argument, plaintiffs hope, is that fishermen would be allowed to catch more salmon in the Klamath Management Zone.

The 1989 regulation, setting a 35,000 natural spawner escapement floor, is designed to ensure that a certain number of naturally *spawning* fish survive, not that a certain number of naturally *spawned* fish survive. There is substantial overlap between the categories of salmon spawning in the wild (naturally spawning) and salmon born in the wild (naturally spawned), but the categories are not identical. Some hatchery-born salmon will spawn in the wild, and some salmon born in the wild will spawn in a hatchery. Consistent with the 1989 regulation, the Council defines natural spawners as "age-three or older fall chinook that spawn outside of the hatchery environment, regardless of their origin." *Ocean Abundance Projections and Prospective Harvest Levels for Klamath River Fall Chinook, 2005 Season*, at 2 (Feb. 2005), *available at* http://www.pcouncil.org.

Plaintiffs contend that the categories of naturally spawning and hatchery spawning Klamath chinook are part of the same "stock of fish" under the Magnuson Act. In their view, the NMFS may not manage members of the same "stock of fish" separately, or treat them differently for conservation purposes. For the reasons that follow, we disagree.

**[4]** A "fishery" is defined under the Magnuson Act as

(A)   one or more stocks of fish which *can be treated as a unit for purposes of conservation and management* and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and

(B)   any fishing for such stocks.

16 U.S.C. § 1802(13) (emphasis added). A "stock of fish" is "a species, subspecies, geographical grouping or *other category of fish capable of management as a unit.*" *Id.* § 1802(37) (emphasis added).

Plaintiffs make two arguments why naturally spawning Klamath chinook are not a separate "stock of fish" within the meaning of § 1802(37). First, they point out that natural and hatchery spawners swim side-by-side in the years between their departure from the river as juveniles and their return as adults. They also point out that the 2005 management measures, in their effort to meet the 35,000 natural spawner escapement floor, limit the overall catch of chinook without distinguishing between natural and hatchery spawners. They argue from these two undisputed facts that natural spawning Klamath chinook are not a "category of fish capable of being managed as a unit" within the meaning of § 1802(37) and are hence not a "stock of fish."

**[5]** We see nothing in the Magnuson Act to compel this understanding of the term "stock." A "category" is "any of several fundamental and distinct classes to which entities or concepts belong," or "a division within a system of classification." Merriam Webster's Collegiate Dictionary 180 (10th ed. 1998); *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1176 (D.C. Cir. 2003) (considering dictionary definition to determine if agency's interpretation of a statute is reasonable). There is nothing in the Act to suggest that natural spawners are not a "division" or "distinct class," and hence a "category," of Klamath chinook.

**[6]** The term "stock" is commonly used and generally understood in fisheries management to allow a distinction between natural and hatchery spawners. The NMFS routinely distinguishes between natural and hatchery stocks in other regulatory contexts. *See, e.g.*, 70 Fed. Reg. 37204, 37208 (June 28, 2005) (adopting hatchery policy under ESA). Similarly, a nonpartisan group of scientists established by Congress to propose hatchery policy differentiates between "hatchery stock" and "natural stock" on a regular basis. *See, e.g.*, Hatchery Scientific Review Group, *Hatchery Reform: Principles and Recommendations*, at 17 (Apr. 2004); Hatchery Scientific Review Group, *Hatchery Reform: Report to Congress*, at 35 (Mar. 2006);**²** Hatchery Scientific Review Group, *Hatchery Reform in Washington State: Principles and Emerging Issues*, Fisheries Magazine, June 2005, at 12.

**[7]** Nor does the phrase "capable of management as a unit" preclude a distinction between natural and hatchery spawners. The NMFS has determined that "the choice of a management unit" may be decided on a number of different grounds; it "depends on the focus of the FMP's objectives, and may be organized around biological, geographic, economic, technical, social, or ecological perspectives." 50 C.F.R. § 600.320(d)(1). This host of possible bases for choosing a "management unit" indicates the term's flexibility. Even assuming that the NMFS managed natural and hatchery spawners separately, plaintiffs do not identify anything in the statute or related regulations that would draw the line for the purposes of defining the appropriate "unit" at the distinction between natural and hatchery spawners.

We also note that although the Magnuson Act does not expressly distinguish between natural and hatchery spawners, a closely related statute does. The Trinity River Basin Fish and Wildlife Management Reauthorization Act of 1996, Pub.

---

**²**The Hatchery Scientific Reform Group's reports are available at http://www.lltk.org.

L. No. 104-143, 110 Stat. 1338, a statute that regulates fisheries in one of the Klamath River's main tributaries, refers to "naturally reproducing anadromous fish stocks." *Id.* § 3, 110 Stat. 1339. The Senate Report on the statute, discussing a Trinity River hatchery, noted that support for the hatchery should "not impair[ ] efforts to restore and maintain naturally reproducing anadramous [sic] fish stocks . . . ." S. Rep. No. 104-253, at 3 (1996). This clear intent to distinguish between natural and hatchery fish sheds light on Congress's wishes for the Magnuson Act. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738-39 (1989) (Scalia, J., concurring) (declaring that it is a "rudimentary principle[ ] of construction" that "statutes dealing with similar subjects should be interpreted harmoniously").

**[8]** In short, we see nothing in the Act to prevent the NMFS from regarding naturally spawning Klamath chinook as a "stock" of salmon within the meaning of § 1802(37), and to prevent the agency from adopting protective measures in an FMP to conserve this "stock." Even without the assistance of *Chevron* deference, we would read the Act in this way. Our obligation to give *Chevron* deference to the NMFS's interpretation of the Act that it is charged to administer removes any possible doubt.

Second, plaintiffs rely on a district court decision interpreting the term "species" in the Endangered Species Act ("ESA") as a basis for interpreting the term "stock" in the Magnuson Act. The ESA requires the NMFS to protect "endangered" or "threatened species." 16 U.S.C. § 1531(b). A "species" under the ESA includes "any distinct population segment . . . of any species of . . . fish . . . which interbreeds when mature." *Id.* § 1532(16). In *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001), the plaintiffs challenged the NMFS's decision to list naturally spawning coho salmon as "threatened." In making this determination, the agency ignored hatchery-spawning coho. *See* 63 Fed. Reg. 42587, 42589 (1998). The district court held that the listing of

naturally spawning coho as "threatened" without regard to hatchery-spawning coho was arbitrary and capricious. In the view of the district court, hatchery-spawned coho populations are part of the same distinct population segment as natural coho populations, and "[l]isting distinctions below that of . . . a [distinct population segment] of a species are not allowed[.]" 161 F. Supp. 2d at 1162.

We did not review the district court's decision in *Alsea* on the merits. *See Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181 (9th Cir. 2004) (dismissing appeal on jurisdictional grounds). But even if the district court in *Alsea* was correct in its interpretation of the ESA (which we do not decide), its decision is not relevant to the question before us. The ESA and the Magnuson Act use different terminologies. The ESA refers to "species," while the Magnuson Act refers to "stock." There is nothing in the ESA, or in the district court's decision in *Alsea*, that even remotely suggests that "species" and "stock" have the same definition.

### 2. "Best Scientific Information Available"

Fishery management plans and their implementing regulations must be consistent with "national standards" for fishery management set forth in 16 U.S.C. § 1851(a). A regulation implementing a FMP will be upheld under § 1851(a) unless the Secretary has acted in an "arbitrary and capricious manner promulgating such regulations." *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996) (internal quotation omitted). Stated another way, we will uphold a regulation against a claim of inconsistency with a "national standard" under § 1851 if the Secretary had a "rational basis" for it. *Id.*; *see also Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1071 (9th Cir. 2005).

**[9]** National Standard No. 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Plaintiffs

argue that there is no scientific basis to support an escapement goal that counts only natural spawners as relevant for conservation purposes. However, plaintiffs frame their argument purely in terms of statutory interpretation. They did not introduce any evidence to dispute the scientific basis for the escapement goal. In effect, plaintiffs would have us construe National Standard No. 2 to require as a matter of law that all Klamath chinook must receive the same consideration for management and conservation. But the statute regulates fisheries, *see, e.g.*, 16 U.S.C. §§ 1801(b)(4), 1851(a)(1), and fisheries include "one or more stocks of fish." *Id.* § 1802(37). As we have just held, a "stock" may reasonably include only natural spawners.

Even if plaintiffs had attacked the evidentiary basis for the escapement goal established in the 1989 regulation, the distinction between natural and hatchery spawners would pass muster on the record before us. "Where scientific and technical expertise is necessarily involved in agency decisionmaking, . . . a reviewing court must be highly deferential to the judgment of the agency." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004). The relevant administrative record for these purposes is the record compiled in 1989 to support the FMP amendment that established the escapement goal. *See* 50 C.F.R. § 600.315(b)(2) (providing that an FMP "must take into account the best scientific information available at the time of preparation"). While the NMFS did not file the 1989 record in this case, the 2005 record contains enough excerpts of that record to allow us to defer to the agency's decisionmaking.

A lengthy analysis conducted in 1986 concluded that the 35,000 natural spawner floor "is needed to protect the production potential of the resource in the event of several consecutive years of adverse environmental conditions." In 1988, the Council found that "[a]n evaluation of available information on the production potential of Klamath River fall chinook indicates that a minimum escapement goal of 35,000 naturally

spawning adults must be protected in all years in order to prevent extended periods of low juvenile production." After a time series modeling test, the Council deemed the 35,000 natural spawner escapement floor "sufficient . . . to protect the stock and reduce the risk of prolonged depressed production," and to "provide a high probability of attaining sufficient escapement for hatchery production needs."

**[10]** There is no evidence in the record that the Council's 1986 and 1988 studies are outdated or flawed. Bereft of any contrary science, plaintiffs' bare allegation that the agency's distinction conflicts with the "best scientific evidence available" fails. *See Nw. Envtl. Def. Ctr. v. Brennen*, 958 F.2d 930, 936 (9th Cir. 1992) (rejecting a "best scientific information available" claim because the challenger "has not pointed to any scientific evidence inconsistent with the Secretary's decision"); *see also Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) (observing that the challenger may have "forfeited" its challenge by not proposing any better science). *Cf. Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1004 (9th Cir. 2004) (affirming regulation based on best scientific evidence available when "no new information" contradicted the agency's data).

### 3.    "Managed as a Unit"

**[11]** National Standard No. 3 provides that, "[t]o the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination." 16 U.S.C. § 1851(a)(3). "The purpose of this standard is to induce a comprehensive approach to fishery management" that is not jeopardized when fish live in the waters of more than one jurisdiction. 50 C.F.R. § 600.320(b). As a Senate Committee Report on the Magnuson Act explained, "unity of management, or at least close cooper[at]ion, is vital to prevent jurisdictional differences from adversely affecting conservation practices." S. Commerce Comm. Rep. No. 94-416 (1975),

*reprinted in A Legislative History of the Fishery Conservation and Management Act of 1976*, at 685 (1976) ("*A Legislative History*"). To further this goal, "[t]he geographic scope of the fishery, for planning purposes, should cover the entire range of the stocks(s) of fish, and not be overly constrained by political boundaries." 50 C.F.R. § 600.320(b).

**[12]** The Senate Report used the Klamath salmon to illustrate the problem addressed by National Standard No. 3:

> [A] State-to-State separation of power is not reflective of the migratory habits of fish stocks, but is due to historic and political factors. As a result, inconsistent regulations have often developed. For example, the State of Oregon maintains a salmon hatchery program. Salmon reared in the Oregon program de[s]cend Oregon rivers and later may be found in California waters. These same salmon may then be caught legally under the California fishing regulations, but earlier in the season and at a smaller size than it would be legal to catch these fish under Oregon's fishing code. Consequently, management of fishery resources from the national or regional perspective is important to sound conservation practices.

*A Legislative History* at 684. When a stock of fish is managed in the same manner throughout its geographical range, National Standard No. 3 is satisfied. *See Stinson Canning Co. v. Mosbacher*, 731 F. Supp. 32, 37 (D. Me. 1990) (no violation of National Standard No. 3 when regulation at issue applies to fish "wherever caught").

**[13]** By defining the Klamath Management Zone to reach from Humbug Mountain, Oregon, to Horse Mountain, California, the Pacific Plan takes into account the migration pattern of the Klamath chinook from the Klamath River to the ocean, and their growth to maturity off the coasts of Oregon

and California. Pacific Plan at 6-2. Salmon fisheries throughout this range, off the coasts of both states, are managed in the same manner to ensure that 35,000 natural spawning Klamath chinook escape. *See* Pacific Plan at 3-9 (stating that the Klamath chinook are a "[m]ajor contributor to ocean fisheries from Humbug Mt., OR to Horse Mt., CA" and should be managed accordingly). The 2005 management measures are thus entirely consistent with National Standard No. 3.

### C.　Attacks on the 2005 Management Measures

Plaintiffs' three remaining claims attack the 2005 management measures themselves. Plaintiffs claim (1) that the management measures are inconsistent with the "national standard" under 16 U.S.C. § 1851(a)(8) requiring that the "importance of fishery resources to fishing communities" be taken into account; (2) that they are inconsistent with the "national standard" under 16 U.S.C. § 1851(a)(10) requiring the NMFS "to the extent practicable" to "promote the safety of human life at sea;" and (3) that the NMFS improperly invoked a "good cause" provision of the Administrative Procedure Act, 5 U.S.C § 553(b)(B), to justify its decision not to open a public comment period. We take these three claims in turn.

### 1.　"Importance of Fishery Resources to Fishing Communities"

**[14]** By its explicit terms, § 1851(a) requires only that FMPs and their implementing regulations be consistent with the "national standards." The 2005 management measures are "actions," not "regulations." For purposes of plaintiffs' two claims against the 2005 management measures based on national standards set forth in § 1851(a), we assume without deciding that the standards of that section apply to actions taken under regulations implementing FMPs as well as to the regulations themselves.

National Standard No. 8 provides that

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks) take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). Plaintiffs claim that the Council inadequately analyzed the economic impact of its 2005 management measures, and that the NMFS inadequately reviewed the measures for consistency with National Standard No. 8.

The regulation implementing National Standard No. 8 provides that an economic analysis must "identify affected fishing communities and then assess their differing levels of dependence and engagement in the fishery being regulated . . . . The analysis should discuss each alternative's likely effect on the sustained participation of these fishing communities in the fishery." 50 C.F.R. § 600.345(c)(3). In addition, "[t]he analysis should assess the likely positive and negative social and economic impacts of the alternative management measures, over both the short and the long term, on fishing communities[,]" *id.* § 600.345(c)(4), as well as "identify those alternatives that would minimize adverse impacts on those fishing communities within the constraints of conservation and management goals of the FMP . . . ." *Id.* § 600.345(c)(5).

In 2004, the Council and the NMFS considered the socioeconomic impact of that year's proposed management measures and issued a lengthy report titled an "Environmental Assessment." That assessment discussed various alternatives to measures satisfying the 35,000 natural spawner escapement floor, addressing their short- and long-term impacts on fishing communities. In April 2005, the NMFS concluded that, "[f]or the fisheries to be conducted under the proposed 2005 ocean

salmon regulations[,] the analysis from the 2004 [Environmental Assessment] is sufficient to understand the range of options developed and the impacts projected . . . for the 2005 season." The NMFS's "Supplemental Finding of No Significant Impact" updated the Environmental Assessment's conclusions for the 2005 management measures and concluded as follows:

> The overall 2005 community income impact of the commercial fishery is projected to be $33.7 million, down 28% from the 2004 value of $46.8 million, and 74% below the 1976-1990 average. The overall community income impact of the recreational fishery is projected to be $394 million, down 16% from the 2004 value of $471 million, and 44% below the 1976-1990 average. Community income impacts projected for both the commercial and recreational fisheries off Washington, Oregon, and California, are well above the disaster levels of the 1994 season.

**[15]** So long as the agency appropriately updates its analysis under National Standard No. 8, there is no reason why it must start from scratch every year. *Compare N.C. Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647, 654 (E.D. Va. 1997) (reliance on previous year's measures without discussion of National Standard No. 8 is improper when the agency had not assessed the previous year's measures for consistency with the standard). Plaintiffs do not identify data missing from the 2004 and 2005 analyses or explain why the analyses in the record fall short of what the Magnuson Act requires. *See Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003). "About the best a court can do" when it reviews the NMFS's performance with respect to National Standard No. 8 "is to ask whether the Secretary has examined the impact of, and alternatives to, the plan he ultimately adopts . . . ." *Id.* We conclude the that NMFS did not abuse its discretion when it relied on a 2004 analysis, updated for 2005, to review the

2005 management measures for consistency with National Standard No. 8.

### 2. "Safety of Human Life at Sea"

**[16]** National Standard No. 10 provides that "[c]onservation and management measures shall, to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10). Plaintiffs contend that, by shortening the fishing season, the 2005 management measures unnecessarily obliged fishermen to go to sea regardless of the weather or other dangers. Thus, according to plaintiffs, the management measures did not, "to the extent practicable," "promote" human safety.

**[17]** The NMFS addressed safety concerns in an April 2005 memorandum commenting on the Council's recommendations:

> The proposed action is expected to be neutral with respect to health and safety. The proposed regulations are within the range of annual regulations implemented since adoption of the salmon framework plan in 1984 and meet the considerations for weather-related safety and harvest opportunity . . . .

Although cursory, this analysis indicates that the NMFS considered National Standard No. 10 and thus discharged its duty under § 1855(a)(10). As stated by the NMFS memorandum, the 2005 management measures do fall within the "range" of measures that have governed fisheries in past years. *See, e.g.*, 56 Fed. Reg. 21311, 21316 (May 8, 1991) (announcing closure of Klamath Management Zone fishery for all but one month). The fact that the measures are "neutral," and do not affirmatively promote safety, does not mean that they do not promote safety "to the extent practicable." We conclude that the NMFS did not act arbitrarily and capriciously when it

assessed the management measures for compliance with National Standard No. 10.

### 3.  "Good Cause" to be Excused from Notice and Comment

**[18]** Finally, plaintiffs claim the NMFS failed to perform the economic analysis required by the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.* When an agency has an obligation to open a public comment period during the rule-making process, the RFA requires it to prepare a "regulatory flexibility analysis." 5 U.S.C. §§ 603, 604. The "initial regulatory flexibility analysis," published after announcement of the proposed rule, must "describe the impact of the proposed rule on small entities" and discuss "significant alternatives" that accomplish the regulatory objectives while "minimiz[ing] any significant economic impact of the proposed rule on small entities." 5 U.S.C. §§ 603(a), (c). The "final regulatory flexibility analysis," published with the final rule, must discuss the reasons why the agency adopted the alternative it did. *Id.* § 604(a).

**[19]** Under the APA, the NMFS must open a public comment period before it adopts annual management measures. *See NRDC, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003); *see also* 50 C.F.R. § 660.411(b). The obligation is excused "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B); *see also* 50 C.F.R. § 660.411(b). When the agency validly invokes the "good cause" exception, the RFA does not apply. *See A.M.L. Int'l, Inc. v. Daley*, 107 F. Supp. 2d 90, 107 (D. Mass. 2000). Citing irreducible time pressure to act before the fishing season began, the NMFS invoked the "good cause" exception when it adopted the 2005 management measures. *See* 70 Fed. Reg. at 23063.

We recently addressed the "good cause" exception in *NRDC, Inc. v. Evans*, a case similar to this one in several respects. There, the plaintiffs argued that the NMFS's failure to provide a public comment period invalidated annual management measures that implemented a groundfish FMP. 316 F.3d at 907-08. The NMFS did not open a public comment period and instead invoked the "good cause" exception under 5 U.S.C. § 553(b)(B). It explained that " '[d]elay in implementation of the measures' " to allow the public to comment " 'could upset [the] balance' " between conservation and harvest exploitation " 'and cause harm to some stocks . . . .' " *Id.* at 908 n.4 (quoting 66 Fed. Reg. 2338, 2371-72 (Jan. 11, 2000)). The NMFS stated that it could not have started the rulemaking process earlier because " '[m]uch of the data necessary for these specifications and management measures came from the current fishing year.' " *Id.* The NMFS has invoked the good cause exception on precisely these grounds each year for the previous decade. *Id.* at 911.

We held that the NMFS had not adequately justified its decision not to open a public comment period. Following *Cal-Almond, Inc. v. United States Department of Agriculture*, 14 F.3d 429 (9th Cir. 2003), we declared that generic "timeliness considerations of rulemaking on an annual basis cannot constitute good cause." *NRDC*, 316 F.3d at 912 (citing *Cal-Almond*, 14 F.3d at 441-42). The agency must "demonstrate . . . some exigency apart from generic complexity of data collection and time constraints[,]" and it had not done so. *Id.* We took pains to note, however, that we did not need to "determine the precise contours of what constitutes good cause in this context[,]" and that "we [did] not mean to suggest that habitual invocation of the good cause exception is itself improper." *Id.* We concluded in *NRDC* that the "NMFS should be free in future years to show that compliance is impracticable under specific circumstances pertinent to the year at issue." *Id.* at 912.

The district court in this case found that the grounds for the good cause exception were adequately explained. It distin-

guished our holding in *NRDC* on the ground that the NMFS's statement "contain[s] a great deal more foundational information, as well as season specific bases, than the very general statement in *NRDC*." 2005 U.S. Dist. LEXIS 34084, at \*46. We agree with the district court. In *NRDC*, the good cause statement simply asserted that data-gathering and timeliness concerns excused a public comment period. Too long to reproduce in full here, the good cause statement in this case fills nearly a page in the Federal Register, and it thoroughly explains why the NMFS could not solicit public comment before the measures' effective date. *See* 70 Fed. Reg. at 23063. The NMFS justified its decision with specific fishery-related reasons, not generic complaints about time pressure and data collection difficulties. It observed that the data on which the management measures are based "are not available until January and February because spawning escapement continues through the fall[.]" The Council does not finish its process until early April, and the season must begin on May 1. The NMFS thus has only a month to finalize the Council's proposals. *Id.* "Delaying implementation of annual fishing regulations, which are based on the current stock abundance projections, for an additional sixty days would require that fishing regulations for May and June be set in the previous year without knowledge of current stock status." *Id.*

[20] The NMFS also explained why season-specific measures, which cannot be ready until early May, must be in place by that time:

> [T]he 2005 forecast ocean abundance for Klamath River fall Chinook requires a reduction in the commercial season length from Humbug Mountain, OR, to the Oregon-California Border from being open from May-June 2004 to being closed in 2005. Without these, and similar restrictions in other areas in 2005, the projected Klamath River fall Chinook escapement floor would not be met.

70 Fed. Reg. at 23063. Taken together, the NMFS's explanations set forth the "specific circumstances pertinent to the year at issue" we found missing in *NRDC*. *See* 316 F.3d at 912.

[21] The fact that the NMFS regularly invokes the good cause exception for the Pacific Plan salmon management measures does not render the exception unavailable for 2005.[3] So long as the NMFS continues to give season-specific reasons for why the good cause exception is needed, its "habitual invocation" is not improper. Because the NMFS properly relied on the "good cause" exception in connection with the 2005 management measures, it did not have an obligation under the RFA to issue a regulatory flexibility analysis.

## Conclusion

[22] The publication of the 2005 management measures in the Federal Register was an "action" under the Magnuson Act. It triggered the thirty-day limitations period during which plaintiffs could challenge both the action and the 1989 regulation implementing the Pacific Plan's 35,000 natural spawner escapement floor. The district court therefore erred when it concluded that plaintiffs' claims challenging the escapement floor were time-barred. However, on the merits, we hold that the district court properly rejected each of plaintiffs' chal-

---

[3]*See* 69 Fed. Reg. 25026, 25035 (May 5, 2004); 68 Fed. Reg. 23913, 23922 (May 6, 2003); 67 Fed. Reg. 30616, 30625 (May 7, 2002); 66 Fed. Reg. 23185, 23194 (May 8, 2001); 65 Fed. Reg. 26138, 26146 (May 5, 2000); 64 Fed. Reg. 24078, 24089 (May 5, 1999); 63 Fed. Reg. 24973, 24983 (May 6, 1998); 62 Fed. Reg. 24355, 24366 (May 5, 1997); 61 Fed. Reg. 20175, 20187 (May 6, 1996); 60 Fed. Reg. 21746, 21757 (May 3, 1995); 59 Fed. Reg. 22999, 23011 (May 4, 1994); 58 Fed. Reg. 26922, 26931 (May 6, 1993) (not invoking "good cause" per se but promulgating "emergency rule" and eschewing notice and comment); 57 Fed. Reg. 19388, 19403 (May 6, 1992); 56 Fed. Reg. 21311, 21318 (May 8, 1991); 55 Fed. Reg. 18894, 18906 (May 7, 1990); 54 Fed. Reg. 19798, 19809 (May 8, 1989); 53 Fed. Reg. 16002, 16012 (May 4, 1988); 52 Fed. Reg. 17264, 17273 (May 6, 1987); 51 Fed. Reg. 16520 (May 5, 1986); 50 Fed. Reg. 18672 (May 2, 1985).

lenges to the 1989 regulation and to the 2005 management measures.

AFFIRMED.